ANDREW H. RINGO, Appellant, *vs.* ELIZABETH RICHARDSON, *et al.*, Respondents.

1. *Evidence—Admissions of deceased person as to resulting trusts.*—Testimony as to verbal admissions of persons, since dead, is to be received with great caution, and whenever it is attempted to prove resulting trusts by virtue of such admissions, the testimony must be clear, strong and unequivocal, and leave no room for doubt in the mind of the chancellor, as to the existence of such a trust. And the admissions should be supported by other circumstances going also to show the existence of the trust.

*Appeal from Ray Court of Common Pleas.*

*Bannister & Hughes, and Hall & Oliver,* for Appellant.

*Geo. W. Dunn,* for Respondents.

SHERWOOD, Judge, delivered the opinion of the court.

Andrew H. Ringo brought suit in the Common Pleas court of Ray county against the heirs of Mathias Teague and others, claiming in his petition, that in August, 1839, one Mathias Teague entered the following described United States Government land, situate in Ray county: The northwest quarter of the southwest quarter of section twenty-two, township 52, of range 28, with money furnished by one Zacheus Routh for that purpose, and with the agreement that said land was to belong to Routh; that Teague accordingly made, executed and delivered a deed to Routh, conveying to him the land, which deed was lost without having been recorded; that Routh took possession of the land at the time of the entry, remained in peaceable possession of the same up to the time of his death, exercising the usual acts of ownership; that Routh died without a will; that plaintiff and his brother bought the land at the administration sale, and received a deed from the administrator, E. A. Lewis, in 1851; that Nelly Routh, the widow of Zacheus Routh, conveyed to plaintiff and his brother her dower interest in the land also in the year 1851; that plaintiff's brother Samuel, and his wife, in 1853, conveyed all their interest in said land to plaintiff; that one of the defendants, Samuel B. Randolph, in 1869, set up a claim to the land as the heir of one Francis M. Randolph,

25—VOL. LIII.

and obtained a decree for title to said land against the heirs of Teague, in the year 1870; that plaintiff was not made a party to that suit; that Samuel Randolph knew that plaintiff was the owner of the land, and had been in peaceable possession thereof, paying taxes, &c.; that the decree was falsely and fraudulently obtained; that in February, 1870, after obtaining this decree, Randolph conveyed to defendant, John Bales, who took with full knowledge of plaintiff's title and ownership, and has since taken possession of the land, cutting timber, &c., &c.

The petition prays for special relief, such as plaintiff regarded himself entitled to, and also for general relief.

The answer of defendant admitted that Mathias Teague entered the land, but denied that Routh furnished the money; but alleged, on the contrary, that F. M. Randolph, the father of defendant, Samuel B. Randolph, furnished the purchase money, $50 00, to Teague to enter the land for said Randolph, but Teague entered it in his own name. Defendants denied that Teague ever executed a deed conveying the land to Routh, in accordance with any understanding or otherwise; that the deed never had any existence, and therefore could not be lost or destroyed; that F. M. Randolph had possession of the land from the time of its entry up to the time of his death, claiming it as his own; that Teague recognized Randolph as the owner, and "always expressed a willingness" to convey the land to Randolph, "but never did so." The residue of the answer is tantamount to a general denial of the other allegations of the petition. A reply was duly filed. On the trial evidence was introduced on the part of the plaintiff, substantially as follows: A deed from Mathias Teague, and wife, to Zacheus Routh, conveying to him the land in controversy, with covenants of warranty, dated, November the 1st, 1841, and duly acknowledged on said day; recorded April 15th, 1872. (This deed was found after suit brought, and placed upon record.) A deed from E. A. Lewis, as administrator of the estate of Zacheus Routh, dated October 8th, 1851, conveying the land aforesaid to Samuel and Andrew H. Ringo, duly acknowledg-

ed and recorded. A deed, dated April 3rd, 1851, from Nelly Routh, widow of Zacheus Routh, conveying her dower in said lands to plaintiff Ringo, and his brother Samuel, duly acknowledged and recorded. A deed to plaintiff, dated November 16th, 1853, from Samuel Ringo, (plaintiff's brother) and wife, conveying their interest in the land. This deed was also duly acknowledged and recorded. Receipts for taxes paid on the land by plaintiff, from 1852 up to 1870. A county plat, showing that land in controversy, N. W. S. W. Sect. 22, entered Aug. 9th, 1839, by Mathias Teague, and the forty acres adjoining it on the south, were entered by Zacheus Routh, November 1st, 1833, as well as the forty acres in section twenty-one, immediately west of the last named forty, February 4th, 1834.

The deposition of Mary W. Mosher, the daughter of Zacheus Routh, and the grand-daughter of Mathias Teague; that the latter entered the land in dispute with $50.00, borrowed from Francis M. Randolph, by Routh; that Randolph went off, and returned in very reduced circumstances so much so, that witness' father let him live on the land, and furnished him with provisions, as the latter said he had not a dollar in the world; that Randolph moved off the same Fall, indebted to a Richmond firm $116, which Routh was surety for, and had to pay; that she had seen the deed from Teague, her grandfather, to Routh, her father, in her father's possession, and heard him read it; that Teague, his wife, and her father, went to Richmond to have the deed fixed; that her father said when he returned, that he had had it fixed, and she saw the deed at that time ; that her father said it was not necessary to have it recorded; that her father died in 1846, and on his death-bed expressed his intention of returning to Ray county from Platte county, where he then lived, and living on land in dispute the rest of his days; that witness does not remember the description of the land in that deed; that she saw it in possession of her mother, Nelly Routh, shortly after her father's death, and heard her sister read it; that her father had sold out his home place in Ray

county on his removal to Platte county, but every Fall he
went back, as he said, to pay taxes on the land, and that this
deed was a warranty deed.

The deposition of John T. Adams, who states he saw
Routh in 1844 with a deed from Teague, acknowledged by
the latter before some officer whose name witness has forgot-
ten; witness picked up the deed and read it, and saw it was
a deed from Teague to Routh, though he does not know
whether it contained a description of the land in controversy,
but believes it did; that this deed was shown by Routh in a
conversation with Jeremiah Routh, his brother, at wit-
ness' father's house, on Crooked River, Ray county, not
more than a quarter of a mile from the land in controversy,
and this while Zacheus Routh was on a visit to Ray county;
and that witness heard him say, he had come down partly on
a visit, and partly to pay taxes on the land; that Zacheus
Routh and his brother were then talking about trading for
the land.

Deposition of Rebecca Adams, wife of the last named wit-
ness, grand-daughter of Zacheus Routh, and daughter of
John A. Collins, who states, that her father lived on the
land she understood to be in controversy; that her grand-
father came and offered to pay her father $70 for his im-
provements if he would move off the land, so he could enter
it, as he lived adjoining and could not do so until her father
would move; that there were present, when this offer and
request was made, witness' great-grandfather, . Mathias
Teague, and his wife, and witness' father and mother; that
her father remarked, that he was going to move any way as
he did not like the place; and her grandfather never paid
her father anything; that this was about the year 1838; that
the improvements were two log houses and 8 or 10 acres
cleared, fenced and in cultivation; she understood the deed,
which she saw, from her great-grandfather Teague to her
grandfather Routh, to be for the land her father lived on,
though she could not read it; she testified, that after her
father left the land, F. M. Randolph went on it and lived

there nearly a year and then left it, and witness does not think any one has lived on it since; that her grandfather Routh or his wife, after they moved to Platte county, came back every Fall to pay taxes on the land, and also to visit relations; that she heard her grandfather say the reason he did not have the deed recorded was, that debts might come against him, though witness did not know what debts he referred to; but understood it was for debts for which her grandfather had become the surety of F. M. Randolph; that her great-grandfather Teague and his wife went to Richmond to make the deed, and after it was made she saw it in the possession of her grandfather Routh, and in the possession of no one else.

W. D. Rice testified to having made out a *pro rata* statement in 1851, showing what was coming to John Bales, defendant, and Andrew H. Ringo on their claims as creditors against Zacheus Routh's estate from the sale of Routh's lands at administration sale; that he had made out plaintiff's tax list from 1851 to 1865, and the land in dispute was always on the list, and plaintiff had paid taxes on it all the time; and that Bales, defendant, told witness to tell plaintiff that he wanted the matter decided; that if he, defendant, lost the land now, he had his recourse now; but if he, defendant, did not bring suit now, he might lose the recourse on the party he bought of.

D. D. Bullock testified, that before the decree was obtained in the suit of Samuel B. Randolph against Teague's heirs, Bales, defendant, told witness he did not wish plaintiff to lose anything; that he was willing to pay plaintiff; and witness' impression is, that Bales said he would pay $300.

Andrew H. Ringo, plaintiff, testified that the land in controversy was purchased by his brother Samuel and himself at the administration sale of land belonging to Routh's estate, and his recollection was, that defendant Bales was present at the sale; that Bales received a portion of the purchase money arising from such sale on a claim he held against the estate of Routh, and the balance witness entered as a credit on a claim

he held on the estate of Routh; that witness paid taxes on the land from the time of his purchase till 1871, and claimed it as owner "during all these years;" that he knew nothing of the suit of Samuel B. Randolph against the heirs of Teague until informed of it, and was not made a party to it.

Edward Collins testified, that when a boy, defendant Bales came to his father's house several times, and wanted to buy Nelly Routh's (witness' grandmother) dower interest in said land.

Nathaniel Bannister testified, that before suit brought by Randolph against Teague's heirs, Bales, on one occasion, on passing close to the land in dispute, spoke about Ringo having bought that land.

The defendants on their part introduced evidence in substance, as follows:

. The decree in favor of defendant, Samuel B. Randolph, against the heirs of Mathias Teague divesting the title of the land in controversy out of said heirs and vesting it in plaintiff (this decree which was evidently a mere *ex parte* affair and met with no resistance, or even appearance on the part of the heirs, was rendered January 12th, 1870, by the Common Pleas Court of Ray county, and plaintiff in this suit was not a party thereto.)

The deed of Samuel B. Randolph and wife to defendant, John Bales, dated February 10th, 1870, and purporting to convey to said Bales "all their right, title and interest" in the land in dispute without any covenants of warranty, and for a consideration mentioned of $300.

The deposition of Rebecca Adamson, formerly Rebecca Routh, daughter of Zacheus Routh, widow of F. M. Randolph, and wife of Eliphalet Adamson: she states, that her former husband, Randolph, died in April, 1839; that her son, Samuel B. Randolph, was born April 20th, 1840; that her former husband, while they were residing in Ray county, Missouri, entered, with his own money, a forty acre tract lying north of the farm owned then by her father, and separated from her father's farm only by Crooked River; that he

took the deed, or patent, in the name of Mathias Teague, but she subsequently states, that she does not know the year the land was entered, nor anything about its entry except by hearsay; has no recollection when her grandfather, Mathias Teague died, nor when her father, Zacheus Routh, died; that no taxes on the land were ever paid, nor the field rented or leased to any one.

The deposition of Eliphalet Adamson, husband of the last named witness, states, that Zacheus Routh died about the year 1847; that a short time before Routh's death, and on several occasions, he told witness, that F. M. Randolph owned forty acres of land lying immediately north of and adjoining his farm which he, Routh, had entered of the United States government; and that witness resided in Ray county from 1833 to the year 1837.

The testimony of Buchanan, Vanderpool and Owen was to the effect only, that the house built by John Collins was not on the forty acres in dispute, but a few steps south of the line; and Vanderpool also stated, that the general impression in his neighborhood was, that the land belonged to A. H. Ringo.

Perry Bales testified, that he knew the land in controversy; some of land cleared before Randolph moved on it; that the latter, assisted by witness, took in about four more acres of ground; that he heard Zacheus Routh say once, pointing over across the creek to the land in controversy, that that was Randolph's land; and that John Bales, defendant, lived close to the land at the time Ringo bought it, and was aware of the latter's purchase shortly after it occurred.

Richard S. Elliott testified, that Zacheus Routh, on several occasions, told him, that the land in controversy belonged to F. M. Randolph, and that Randolph's money entered the land, or that he furnished the money to enter the land; that this was a long time ago and witness' memory was not distinct; that he might be mistaken, but thought he was correct; and that one reason of his thinking so was, that he was a young man then, and was talking about trading for the land; and that Mathias Teague told witness, that Randolph furnished the money to enter the land in dispute.

The court upon this evidence entered a decree vesting the title of the property in controversy, in defendant, John Bales, against the plaintiff, and also against the co-defendants of said Bales; and after a motion for new trial was overruled, plaintiff brings this cause here by appeal.

Ringo, the plaintiff, not having been made a party to the suit of Randolph against the heirs of Teague, the decree in that cause, divesting the apparent title out of said heirs and vesting it in Randolph, was wholly inoperative so far as Ringo was concerned, and this being the case we will consider the matter involved in this record precisely as if Randolph were plaintiff in the present suit, and attempting to assert therein a resulting trust in his favor in opposition to the claims of Ringo.

And first we will examine the testimony adduced on the part of the defendant.

The testimony of Rebecca Adamson, that her former husband, F. M. Randolph, furnished the purchase money and entered the land in controversy in the name of Mathias Teague, is based, as she herself admits, on the representations of others; she does not know in what year either her father, Zacheus Routh, or her grandfather, Mathias Teague, died. But she states positively, that no taxes were ever paid on the land, nor was the field on the land ever rented or leased to anybody; she does not know when the land was entered; but she states, that her former husband, Randolph, died in April, 1839, a date, which above all others, she might be supposed to clearly recollect, while the entry on the county plat shows, that the particular forty acres were entered August 9th, of that year.

The testimony of Eliphalet Adamson, her husband, is stronger, reciting, as it does, the alleged statement of Routh, that F. M. Randolph owned the forty acres in dispute; and that he, Routh, had entered it of the United States government.

The statement of Buchanan, Owen and Vanderpool to the effect, that the house built by Collins was not on the particu-

lar forty acres referred to; but some twenty steps south of the line, is a matter of no importance, as Collins' houses and clearings were only used as a means of identifying the tract in dispute. But the testimony of Vanderpool, that the general impression, which prevailed in his neighborhood, that the land belonged to the plaintiff, A. H. Ringo, may not be altogether valueless as having some tendency taken in connection with other circumstances to show, that a party desiring to acquire the title would be readily directed to Ringo, the claimant, for information.

Perry Bales testimony shows, that John Bales clearly had sufficient information to put him on inquiry as to Ringo's title, and his statement, that Routh once told him while pointing to the land in question, that that was Randolph's land. has some slight tendency to establish the resulting trust asserted by Samuel B. Randolph as between the latter and Ringo.

The statement of the witness, R. S. Elliott, as to what was said by Mathias Teague, that Randolph furnished the money to enter the land, is entirely consistent with the idea, that the money was borrowed of Randolph, and by no means within and of itself implies, that there was any resulting trust arising therefrom ; and besides it does not appear at what time Teague made these statements, and this is important, as after a transfer by him of the legal title he would be powerless to impress it by his declarations or admissions.

The further statement of the witness, that Zacheus Routh had, on several occasions, told him, that the property in litigation belonged to Randolph, would be entitled to some weight as between Randolph and those who claim under Routh. But Routh's alleged statement, that Randolph's money entered the land or that he furnished the money to enter the land, can have but the slightest, if indeed any, tendency to establish a resulting trust in Randolph's favor, as even if the money was so furnished, it is not at all inconsistent with the idea of a loan.

It will be seen then, that Randolph's case rests on the

statement of Eliphalet Adamson, Perry Bales and R. S. Elliott, as to verbal admissions made many years previously by Teague and Routh, persons long since dead.

In regard to these verbal admissions the well established rule is, that they are to be received with great caution. Mr. Greenleaf with respect to these admissions uses this language:

"The evidence consisting, as it does, in the mere repetition of oral statements is subject to much imperfection and mistake; the party himself either being misinformed or not having clearly expressed his own meaning or the witness having misunderstood him. It frequently happens also, that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say." (1 Greenl. Ev., §§ 45, 97, 200.)

But taking it as true, that the statements made by the witnesses were correct in every particular, they stand alone unsupported by a single corroborating circumstance, and furnish no basis whatever to warrant a chancellor in declaring a trust in Randolph's favor as to the land in dispute; and the unsatisfactory nature of this testimony is more especially apparent when that testimony is considered in connection with the non-assertion and dormancy of the alleged trust, the entire failure to pay taxes on, or to exercise acts of ownership over, the land for thirty long years, during which period the rights of others accrued. And there is not the slightest excuse offered to account for this singular neglect, one entirely unaccountable except upon the hypothesis that no such trust existed.

In Baker vs. Vining, 30 Maine, 121, the court says, in speaking of these trusts: "And so cautious have courts been in reception of such evidence (meaning oral), although the proofs have been allowed to be read, yet if there was any secret in the cause not understood, the relief sought has been denied." And further, in that case it is said, quoting from Chancellor Kent, in Boyd vs. McLean, 1 Johns. Ch., 582,

where he says, the cases uniformly show, that the courts have been deeply impressed with the danger of this kind of proof, as tending to perjury and the insecurity of paper titles, and they have required the payment by the *cestui qui trust* to be clearly proved. Other authorities hold, that the evidence in support of the alleged trust is a dangerous species of evidence, and therefore to avail anything must be clear, strong and unequivocal and leave no room for a reasonable doubt in the mind of the Chancellor as to the existence of such a trust. A mere preponderance of evidence will not do in such cases. As seen above, the evidence falls far short of the mark in the present case. It is not by any means clearly proven, that Randolph's money as such entered the land in litigation, but it is only to be very remotely inferred from what are said to be the declarations of Teague and Routh. In Johnson vs. Quarles, 46 Mo., 423, with regard to evidence of the declarations of a deceased person respecting the ownership of the money in cases of alleged resulting trusts, it is said :

" Evidence of such declarations it is true is admissible, but it never amounts to direct proof of the fact claimed to have been admitted by those declarations." * * * *

"If however these declarations were properly sustained by other circumstances—as by evidence that the claimant's money was placed in the hands of the deceased for investment, and the property was treated by the parties as their property, or by any other facts pointing to them as the equitable owners—they would warrant us in sustaining the claim."

In the case we are now considering the declarations were wholly insufficient and were entirely unsupported by any circumstances pointing to F. M. Randolph as the equitable owner. On the contrary, the circumstances of this case point almost, if not altogether, conclusively the other way. (See Snelling vs. Utterback, 1 Bibb, 609 ; Johnson vs. Quarles, 46 Mo., 423 ; Baker vs. Vining, 30 Maine, 121 ; Malin vs. Malin, 1 Wend., 625 ; Enos vs. Hunter, 9 Ill., 211 ; Boyd vs. McLean, 1 Johns. Ch., 582 ; Faringer vs. Ramsey, 2 Md.,

365; *Ib.*, 447; Hollida vs. Shoop, 4 Md., 465; Forrester vs. Scoville, 51 Mo., 268.)

But what have we on the part of the plaintiff to meet the doubtful, inconclusive testimony offered on the part of Randolph?

The very deed whose existence plaintiff desired to have established by the decree of the court, an ancient deed over thirty years old, from Mathias Teague to Zacheus Routh, and in addition to that the oral and other testimony offered by plaintiff, tend much more strongly to establish a resulting trust in behalf of Routh, than the testimony of Randolph does to establish such a trust in behalf of his father.

As we have seen, it always requires parol evidence of the most definite and positive character to establish a resulting trust at all; but a review of the authorities shows, that it requires evidence falling but little short of demonstration to establish a resulting trust in the face of an absolute deed and long continued acts of ownership thereunder. For it must be remembered, that the deed in this case is *prima facie* evidence of the verity of its contents, and that there is some evidence offered by plaintiff tending to show, that Routh from the time of his purchase, or at least for a number of years prior to his death, paid taxes on the land in dispute, and the evidence is positive, that Ringo, from the time of his purchase, a period of time from 1851 to 1871, twenty long years, paid the taxes.

To allow Randolph at this late day to defeat this deed and overturn this long established legal title, even if his proofs were of the most satisfactory and convincing character, would be to foster *laches* and offer a premium to neglect.

Under the circumstances of this case Randolph cannot be regarded in the light of a purchaser for a valuable consideration, but only as a mere volunteer; so that, though no notice as to him has been shown, he was entitled to none. He took nothing by his decree, and Bales purchasing from him with notice took no more by his deed.

The judgment is reversed, and this court proceeding to do

that which the court below should have done upon the evi-
·dence, a decree will be entered here in favor of the plaintiff,
removing the cloud cast upon his title by the decree in favor
of Randolph against the heirs of Teague, and forever enjoin-
ing and restraining such heirs, and all the other parties de-
fendant to this suit, from ever setting up or claiming any title
to the premises in dispute; and that the plaintiff recover of
the defendant, John Bales, the possession of said premises
and his costs in both courts.

Judges Napton and Wagner absent; the other Judges
concur.