## FANNING, *Appellant*, v. DOAN.

### Division One, May 25, 1897.

1. **Evidence**: RECOLLECTION OF REMOTE CONVERSATION: MISTAKE IN DEED. Courts of chancery place little reliance upon testimony of loose and remote conversations or confessions of a person when used to overthrow a legal title; but this is not true because of a want of credibility in the witnesses, but in consequence of the extreme un-certainty of the human recollection, and the inability of the human mind to detail after years have elapsed the exact language used by the speakers.

2. **Appellate Practice**: WEIGHT OF EVIDENCE IN EQUITY CASE. Where all the evidence material to the issues is either undisputed or contained in depositions, the chancellor has no better opportunity of weighing it than has this court, and hence this court will give to the testimony in the case that consideration that it may think it deserves.

3. **Evidence**: SETTING ASIDE DEED BY PAROL TESTIMONY. Before a deed can be set aside by parol testimony that it was made through mistake of the writer to correctly express the intention of the parties, the evidence must be convincing and positive that the mistake was made; it is not sufficient that the mistake has been shown by the preponderance of the evidence, but the mind of the chancellor must be thoroughly convinced that the deed does not express the intention of the parties.

4. ————: ————: LIFE ESTATE: REMAINDER. A deed conveyed to the defendant "and her heirs by John Doan, their heirs and assigns forever" certain lands. Doan was dead at the time the deed was made. *Held* to create in defendant and her four children by Doan a vested estate in cotenancy, *and* that such deed would not be so reformed as to create a life estate in the defendant with remainder in such ones of said four children as might survive her, where the testimony showed that the defendant and three of the children had bought and exchanged the land affected by, and had otherwise for fifteen years acted in harmony with the clear meaning of, the deed, and that the testimony to set it aside consisted of the remembrance by three or four persons of conversations heard by them twenty years previous, in the detailing of which it appeared that they had been aided by memoranda furnished them by the litigant for whom they testified.

*Appeal from Grundy Circuit Court.*—HON. PARIS C. STEPP, Judge.

REVERSED AND REMANDED (*with directions*)

*A. H. Burkeholder* and *George Hall & Son* for appellant.

(1) . Before the court will reform the deed on account of mistake, the mistake must be made out by evidence which will strike the mind of the chancellor as free from reasonable doubt. *Steinberg v. Ins. Co.,* 49 Mo. App. 255; *Forrester v. Scoville,* 51 Mo. 268; *Atkison v. Henry,* 80 Mo. 151; *Tesson v. Atlantic Mutual Ins. Co.,* 40 Mo. 33; *Sweet v. Owens,* 109 Mo. 1; *Turner v. Shaw,* 96 Mo. 22; *Johnson v. Quarles et al.,* 46 Mo. 423. (2) The mistake, if any was made, was the mistake of Benajah. Doan alone, and to authorize a court of equity to correct, the mistake must be mutual. *Brocking v. Straat,* 17 Mo. App. 296; *Kennerty v. Etiwan Co.,* 53 Am. Rep. 669; *Steinberg v. Phoenix Ins. Co.,* 49 Mo. App. 255; *Tesson v. Ins. Co., supra; Roberts v. Derby,* 68 Hun. 299; *Bartlett v. Brown,* 121 Mo. 353. (3) The deed from John Doan to Benajah Doan, and the deed from Benajah, under which defendant claims title, was voluntary, and without consideration, and courts of equity will not correct or reform the same. The party asking the relief must stand on some equity superior to that of the party against whom he seeks it. 15 Am. and Eng. Ency. of Law, 678, and note 2; *Henderson et al. v. Dickey et al.,* 35 Mo. 120; *Hoyt v. Oliver et al.,* 59 Mo. 188; *Brocking v. Straat,* 17 Mo. App. 296; *Rhodes v. Outcalt et al.,* 48 Mo. 367; 1 Story's Eq. [9 Ed.], secs. 176, 164, 793*d; The German Mutual Ins. Co. v. Grim,* 2 Am. Rep. 341; *Powell v. Powell,* 73 Am. Dec. 724, and note; Perry on Trusts [4 Ed.], sec. 186; *Ib.,* sec. 163; *Lane v. Ewing,* 31 Mo. 75; *Jefferys v. Jefferys,* 1 Craig & Phillips, 138, 144; *Holloway v. Headington,* 8 Simons R. 325. The same rule applies as to executions of powers and trusts. 1 Story [6 Ed.], secs. 177, 433; 2 Story [6 Ed.], secs.

706*a*, 787, 793*a*, 793*b*, 973, 974, note 1, and 987.   (4)
The grantor in the deed sought to be reformed, also
Daniel Doan and Deborah, wife of appellant, all being
dead and the heirs of Benajah Doan, the grantor, not
being a party to the action, the deed can not be re-
formed.   15 Am. and Eng. Ency. Law, 681, and note
2; *Adams v. Stevens*, 49 Me. 362; *Cady v. Potter*, 55
Barb. 463; *Custer v. Sitts*, 6 Hun. 659; Adam's Eq. [6
Am. Ed.], 349; Story's Eq. [6 Ed.], sec. 165; *Dennis
v. Dennis*, 4 Rich Eq. 307; *Mayo v. Foster*, 2 McCord
Eq. 137; *Daggett v. Ayer*, 18 Alt. Rep. [N. H.] 169.
(5) Defendant has been guilty of such laches as will
prevent a recovery in the case.   *Jennings v. Brizeadine*,
44 Mo. 332; *Steinberg v. Phoenix Ins Co.*, 49 Mo. App.
255.   (6) The testimony shows that respondent by her
acts construed the deed to create a joint tenancy in
herself and children.   She should not be permitted to
claim a reformation now, and the court should not dis-
regard the construction she placed upon the instrument.
*Goodyer v. Carey*, 4 Blatchf. 271; *Gaslight Co. v. St.
Louis*, 46 Mo. 130; *Jones v. DeLassus*, 84 Mo. 541.

*O. G. Bain* and *Harber & Knight* for respondent.

(1)   It is incumbent upon the party alleging the
mistake to clearly establish it by satisfactory proofs,
but he is not bound to establish the mistake beyond a
reasonable doubt.   *Hutchison v. Ainsworth*, 73 Cal. 452;
*Leitensdorfer v. Delphy*, 15 Mo. 160.   (2) The rule in
this class of cases as to mutuality is that the court
looks beyond the instrument sought to be reformed to
the real agreement between the parties, and if the evi-
dence satisfy the court as to what that agreement was,
the reformation goes upon the theory that the real
agreement has never been reduced to writing; the
doctrine was well and early stated in the old case of

*Leitendorfer v. Delphy*, 15 Mo. 160; *Cassidy v. Metcalfe*, 66 Mo. 519; *Clayton v. Freet*, 10 Ohio St. 544; *Stone v. Hale*, 52 Am. Dec. 187; *Griffith v. Townley*, 69 Mo. 13. (3) Appellant's counsel contend, in point 3 of their brief, that because the deed in this case was without consideration a court of equity will not correct or reform a mistake therein. The only difficulty is in the application of the general principle, that is, whether the agreement is executory or executed; the law may be stated, on the one hand, to be that a court of equity will not enforce an executory agreement based upon a voluntary consideration, while, upon the other, where a trust is created and is perfect and complete, the trust will be enforced, notwithstanding the consideration is voluntary. *Lane v. Ewing*, 31 Mo. 75; *Leeper v. Taylor*, 111 Mo. 312; Perry on Trusts [4 Ed.], secs. 97, 98, note 1 and 99; 1 Story, Eq. Jurisprudence, secs. 463, 434, 706 and 793*b; Bunn v. Winthrop*, 1 Johns. Ch. 329; *Stone v. Hackett*, 12 Gray, 227. (4) Appellant insists that because his wife Deborah, Daniel and the grantor Benajah are all dead, and not having been made parties, that therefore respondent is not entitled to the relief prayed. Appellant alleges that he is the sole representative of his deceased wife, in court claiming by and through her, who was a daughter of the defendant, and Benajah Doan was not a necessary party to this suit. He was simply a dry trustee of the legal title, holding it for the sole purpose of conveying it as the terms of his trust imposed; the conduit through which the title was to pass. He had no beneficial interest whatever in the property, and his representatives have no possible interest. Story's Eq. Pl. (1892) [10 Ed.], sec. 214*a; Brandon v. Carter*, 119 Mo. 581. But even if there "had been a defect of parties plaintiff or defendant," appellant can not now be heard to complain, for by plain statutory provision,

such defect must be taken advantage of by demurrer or answer. R. S. 1889, secs. 2043–2047; *Rogers v. Tucker*, 94 Mo. 346; *Edmonson v. Phillips*, 73 Mo. 57; *Donahue v. Bragg*, 49 Mo. App. 273; *Mississippi Planing Mill v. Presbyterian Church*, 54 Mo. 520. (5) There is absolutely no foundation for the claim of laches in this case; the facts are, and the proof is, that respondent always thought as did her children, as did Benajah Doan to the day of his death, as did appellant himself for almost ten years, that respondent had a life estate under her deed, and in fact as did her attorney until the decision, differently construing the deed, on the former appeal of this case. *Rubey v. Barnett*, 12 Mo. 30; *Landis v. Saxton*, 105 Mo. 486; *Johnson v. Smith's Adm'r*, 27 Mo. 591.

BRACE, J.—This is an action of ejectment to recover the possession of an undivided one fifth of a tract of land in Grundy county, described in the petition. The undisputed facts in the case are, that in the year 1861, the defendant, who was then a widow having children then and still living, by two former marriages, intermarried with one John Doan. That they lived together as husband and wife on the farm of said John in said county from that time until his death; that there was born to them of the marriage four children, John, Daniel, Deborah, and Reeves S. That on the sixth of November, 1876, the said John Doan died, leaving the said Sarah, his widow, and her said children by him, surviving. That a short time prior to his death, to wit, on the fourth day of October, 1876, the said John Doan, Sr., by general warranty deed in which his said wife joined, conveyed his said real estate containing seven hundred and twenty acres to his brother Benajah Doan, of Muskingum county, Ohio, for the expressed consideration of $10,000. That in fact, no consideration whatever was paid for said deed, but the title was

so placed in the said Benajah to be by him held in trust for the benefit of the wife of the said John, Sr., and his said children by her. That on the fourth of October, 1877, the said Benajah Doan for the consideration of $400 conveyed forty acres of said land to one Cyrus Gates of Grundy county, and afterward on the fifth day of March, 1878, the said Benajah in execution of said trust duly executed, acknowledged, and delivered the following deed for the remainder of said real estate, under which both parties claim:

"Know all men by these presents, that I, Benajah Doan, of the county of Muskingum, in the State of Ohio, for and in consideration of the sum of eight thousand ($8,000) dollars to me in hand paid by Sarah A. Doan and her heirs, per John Doan, of the county of Grundy, State of Missouri, the receipt whereof I do hereby acknowledge, have remised, released, and forever quitclaimed, and by these presents do remise, release, and quitclaim unto the said Sarah A. Doan and her heirs by John Doan, their heirs and assigns forever, the following of said premises situate in the county of Grundy, and the State of Missouri: All of the east half of the southeast quarter of section number twenty-two (22); the northeast quarter of the northwest quarter, the south half of the northwest quarter, the southwest quarter of the northeast quarter, the west half of the southwest quarter, and the northeast quarter of the southwest quarter of section number twenty-six (26); the southeast quarter, the southeast quarter of the southwest quarter, the southeast quarter of the northwest quarter, and the south half of the northeast quarter of section number twenty-seven (27), all in township number sixty-two (62), of range number twenty-four (24), containing, according to the government survey, six hundred and eighty acres more or less, and all the estate, title, and interest

of the said Benajah Doan, either in law or equity, of, in, and to said premises, together with all the privileges and appurtenances to the same belonging. In witness whereof, I have hereunto set my hand and seal, this 5th day of March, A. D. 1878. Benajah Doan. (Seal)."

The defendant administered the estate of her deceased husband, and continued to reside with the children on the premises. Afterward, in the month of July, 1881, the said Deborah, daughter as aforesaid of the said John and Sarah Doan, intermarried with the plaintiff and in November, 1882, thereafter, died intestate leaving as her sole heir, her son John H. Fanning, born of said marriage. Afterward, to wit, on the third day of August, 1883, the said John H. Fanning also died, leaving the plaintiff, his father, his only heir at law. After the death of this grandchild the defendant and her said three sons, John, Daniel, and Reeves, took exclusive possession of said real estate; on the eighteenth of October, 1884, sold and conveyed by warranty deed about fifty acres thereof to one Eli Hotchkiss; and afterward divided the remainder among themselves, each taking possession of the lands set off to her or him, and receiving a warranty deed therefor from the others, all of said deeds bearing date November 30, 1891. By such division the lands described in the petition, containing one hundred and ninety-four acres, were thus set off and conveyed to the defendant who took and now holds exclusive possession thereof.

On the nineteenth of July, 1893, the plaintiff instituted this suit in the Grundy county circuit court to recover the one undivided fifth part of the premises so held by the defendant, claiming that as the sole heir of his said son, who was the sole heir of his mother the said Deborah, under said deed to Banajah Doan, he was seized in fee simple of an undivided fifth

part thereof as tenant in common with the defendant. To the petition the defendant interposed a demurrer, claiming that by said deed an estate for life in said lands was vested in the defendant, remainder in fee to her children by John Doan, and that the children or their heirs had no cause of action against the defendant, the life tenant, for the recovery of the possession thereof. The demurrer was sustained by the circuit court and from the judgment thereon in favor of the defendant, the plaintiff appealed to the Supreme Court where the judgment of the circuit court was reversed and the cause remanded, the Supreme Court holding that by the deeds from Benajah Doan the title in fee simple to the premises conveyed was vested in the defendant and her said children by John Doan in common. 128 Mo. 323. After the case was remanded, and on the twenty-fifth day of November, 1895, the defendant filed her answer setting up as a defense to plaintiff's cause of action "that prior to and at the time of making said conveyance by her and her said husband to said Benajah Doan, it was agreed and fully understood between them that said conveyance should be and was made to the said Benajah in trust for the purpose that the title in said premises so far as then owned by defendant's said husband, and this defendant might, by said Benajah, be conveyed to this defendant for and during her natural life, with remainder to her children by John Doan, that might survive her. That the said Benajah accepted the said trust and in his attempt to carry out and fully discharge same, made, executed, and delivered to defendant the deed and instrument aforesaid. That it was fully agreed and understood between the said Benajah and the said John Doan, during his life, and this defendant, at the time of the making of said conveyance by the said John to Benajah, as well as at the time of the making

of said conveyance by the said Benajah to her, that the said Benajah would and should convey to defendant the said premises for and during her natural life, with remainder therein to her children by John Doan that might survive her, and defendant says that if the instrument aforesaid fails to convey such estate to her with remainder to her said children, it was by reason of a mistake, oversight, or neglect of the scrivener or writer thereof to write and make the same as requested, intended and directed by the said Benajah;" and praying that said deed be so modified, changed and reformed as to conform to the intention and agreement of the said John, Benajah and the defendant, and carry out said trust, and convey to said defendant an estate in said premises for life with remainder to her children by said John Doan who may survive her. On this plea issued was joined by reply.

In support of the plea the defendant introduced the depositions of three witnesses, viz., Jerome F. Fairly, Benajah D. Doan, and William P. Doan.

*Fairly* testified in chief that he was a farmer fifty years of age, was living on a farm of and working for John Doan in the summer of 1876, when Benajah Doan, the brother of John, and his nephew Benajah D. Doan were on a visit to John at his home in Grundy county; that he heard conversations between John and his brother about his land in Grundy county, and then proceeded as follows:

"*A.* Well, I heard them on two different times talk about it. They were both getting old. Mr. John Doan's health was quite poor. He had something like a cancer on his leg, and they talked a good deal about their affairs. I heard Mr. John Doan tell him he wanted to 'fix it so everything would go to Sarah Ann' (that's his wife) 'during her life, and then to her and his children that might outlive her.' John told him

'he would make the deed to the farm that he lived on there in Grundy county, Missouri,' and it was intended to make it while Benajah was here, but it was on account of, I think, Mr. John Doan being unable to get to town. This is the second conversation that I heard John tell him: 'Well, Benajah, as soon as I can get time I will make you a deed to (this) place,' where he then lived, and 'you make it back to Sarah Ann, so she will have it during her lifetime, and then to my and her children then living.' He spoke of the children all being small, and he said he knew 'Sarah Ann would take care of them as best she could during her life, and Sarah Ann's health was not very good and he wanted her to have plenty as long as she lived,' and his surviving children, and that he (John) wanted to avoid costs and litigations and in this way he said the children would not likely have to have guardians appointed for them, and Benajah agreed with him that the way he desired was probably the best, and promised to make the deed back to Sarah Ann for her life, and then to her and his children then living. I know that John and Sarah Ann, his wife, went to make the deed, and he came back and said he had made the deed and was satisfied. He made the deed a short time after Benajah returned to Ohio.''

It seems that this evidence in chief was taken by the notary before the arrival of counsel, and on cross-examination by plaintiff's counsel after their arrival, the witness testified: ''My answers to the interrogatories made this morning prior to the arrival of yourself and Mr. Harber were made partly from memorandum prepared by me in part, the remainder was made by Mr. Reeves S. Doan; that is, we went over and canvassed dates together. Mr. Doan and I talked over this matter last night. He was at my place last night

when we made the memorandum. I have not got the memorandum; Doan (R. S.) had it the last I saw of it; it was mostly in reference to Benajah's visits; don't know how long it was, or how many lines were written on it."

*Benajah D. Doan*, whose deposition was taken November 26, 1895, at Young Hickory, Ohio, *present A.Knight*, for the defendant and *no counsel* for plaintiff, *testified:* That he was aged thirty-six years; that he was a son of William P. Doan, and great nephew of the defendant and Benajah Doan, and resided in Muskingum county, Ohio, and then proceeded as follows:

"I went from Ohio with Uncle Benajah Doan, to Grundy county, Missouri, in the fall of 1876, to visit Uncle John Doan and his family. Uncle Benajah Doan and I remained in Missouri, at Uncle John Doan's, at this time, some three weeks. They, Uncle Benajah and Uncle John, were both getting old and the health of either was not very good. Uncle John was suffering with something that appeared to be of a cancerous nature. I heard Uncle John and Benajah, upon several occasions, talk about their affairs before we left for our home in Ohio. I heard Uncle John tell Uncle Benajah he would send him a deed to his land, and he wanted Uncle Benajah to then deed it back to Sarah A. Doan (his wife) for her life, and at her death to hers and his children that might be then living. He said he wanted to fix it so Sarah A. Doan would have everything during her life and then it would go to her children that might then be living by him.

"This was the talk between his wife, Sarah, and both the men, and so they all understood it. I am acquainted with George M. Williams. He has not lived in this county for several years. Uncle fre-

quently talked to me about this matter, both before
and after the deed was made back to Sarah A. Doan,
by Uncle Benajah.  He said he did not know but what
John's idea was  right to let his wife have everything
during her life, and then let it go to his children.  That
if the children were deserving she would care for them,
and if they were not, they would squander the prop-
erty that was given them.  Benajah  Doan  died  about
June, 1884.''

*William P. Doan*, whose deposition was taken at
the same time and place, and  under  the same circum-
stances, *testified:*  That he was sixty-two  years old,  re-
sided  in  Muskingum  county,  Ohio,  was a nephew of
Benajah Doan, who was an old  bachelor,  and  was his
business partner, and then proceeded as follows:

''In the fall of 1876 Uncle Benajah,  with my son,
Benajah, visited Uncle John  Doan  and  his family,  at
their home in Grundy county, Missouri.   A short time
after Uncle Benajah's return  here,  he received a deed
from Uncle John and his  wife  Sarah,  to  about six  or
seven  hundred  acres  of  land in said Grundy county,
Missouri.   A letter from Uncle John to Uncle Benajah
accompanied the deed.  I was the executor of the last will
and testament of Uncle Benajah Doan, and had charge
of all his papers.   I have looked carefully  through  all
of his papers, and everywhere  I  thought  possible  this
letter might be, but have been unable to find it.   I am
sure it is lost or destroyed.  I read  the  letter,  in  fact
I looked after and attended to  Uncle Benajah's busi-
ness matters.   The letter read  about  this way:  'I en-
close deed as we talked.   1 want you to deed  the land
back to Sarah A. Doan for her  lifetime,  then  to  her
children  by  John  Doan  that  may  be living then.'
His signature,  John  Doan.   I think  Uncle Benajah
had me answer this letter for him to Uncle  John,  and
telling  him  he  had  received his  letter and deed and

would make the deed as he desired soon.　Uncle Benajah was unable to write at this time.

"In November, 1876, we learned of Uncle John's death, and the making of the deed was neglected from time to time, until March.　At this time, I went for Uncle Benajah and secured a notary, a Mr. George M. Williams, who came to my house, to whom we showed the letter, that accompanied this deed.　Either Uncle Benajah informed the notary how he wanted the deed made, and it was Uncle Benajah's wish, and I think it was he who informed the notary, that he wanted to make a deed to Sarah A. Doan, for her lifetime, and at her death to go to her children by John Doan (who was then dead) that might be living, and so the deed was written as I and Uncle Benajah always supposed, and the deed acknowledged, and I think I mailed it to Sarah A. Doan.

"The deed here shown me is the deed that Mr. Williams wrote for Uncle Benajah to Sarah A. Doan, referred to by me herein, and it shows to be recorded in book Z, page 640, in the office of the recorder of deeds for Grundy county, Missouri.　Uncle Benajah Doan died 2d day of June, 1884."

The defendant was also permitted to read in evidence in rebuttal, over the objection of the plaintiff, the following affidavit:

"*George M. Williams*, being sworn, says:

"'I have read the foregoing, purporting to be copies of the deposition of Benajah Doan and Wm. P. Doan, in the case pending in the circuit court of Grundy county, Missouri, wherein John H. Fanning is plaintiff and Sarah A. Doan is defendant.

"'I wrote and took the acknowledgment of the deed therein mentioned from Benajah to Sarah A. Doan.　The facts stated by them, in reference to the writing of said deed, the instruction given, and the

intention and desire of said Benajah, are as I remember them, and as I supposed I had written said deed. And I further remember Hannah Pearson witnessing said deed.                 GEORGE M. WILLIAMS.'

"STATE OF OHIO,    }
"County of Henry,  } ss.

"Subscribed and sworn to before me, this 26th day of December, 1895.        EDWARD WARD,
                             "Notary Public."

To support the issue to the plea on his part the plaintiff read in evidence the depositions of the said Benajah D. and William P. Doan taken at Young Hickory, on the sixth of March, 1896, both parties being represented by counsel. The examination in chief for the plaintiff being in the nature of a cross-examination of these witnesses on the evidence contained in their previous *ex parte* depositions, and directed mainly to the purpose of testing their memory of the facts therein stated. They maintained the correctness of the statements contained in their former depositions, but no additional facts bearing directly upon the issue were elicited. It did appear, however, from the deposition of Benajah D. Doan that it was through his agency that the foregoing affidavit of Williams was procured, that his own deposition was taken after consultation with Reeves S. Doan, and the defendant's attorney *Knight*, who explained to him the controversy and the situation of the case. That he could not give the words used in the conversation between John Doan and his uncle Benajah, as to how the deed was to be made, and that he only undertook to give the substance, intent and meaning of the parties, and not their exact language, and from the deposition of William P. Doan it appeared that he had not seen the letter from John Doan to his uncle Benajah for eighteen years, and while he could not tell all that was in the

letter he could repeat the language about who the land was to be deeded to, because "I thought it so strange in him saying to deed it to Sarah A. Doan and her heirs by John Doan *now living;* I could not under-stand—could not see why he put that in."

The plaintiff then introduced in evidence the depo-sition of George M. Williams, the notary before whom the deed was acknowledged, who, omitting his irrele-vant and incompetent statements, testified substan-tially as follows: "I am aged 49 years; my residence is Young Hickory, Ohio; my occupation, school teacher. I wrote the deed in question from Benajah Doan; Wil-liam P. Doan was present. Uncle Benajah Doan instructed me how to write the deed. I wrote it as in-structed. I can not remember whether the instruction was oral or written. I do not remember that any let-ter from John Doan telling how the deed should be written was furnished me. I do not remember seeing any letter of that kind. I can not remember the de-tails of the deed, but I remember that the conveyance was to 'Sarah A. Doan and her heirs by John Doan;' the deed was signed by Benajah Doan and acknowl-edged before me," and on cross-examination he said in substance: "While the deed does not say so, it is my impression that he intended to convey a life estate to Sarah A. Doan. Of course if I was positive beyond a doubt that a life interest was to be conveyed at the time, I should have no doubt used the appropriate terms to convey said idea. Yet while I feel certain of this, I do not feel certain enough to say I know this, and then did not use the terms to convey that idea * * * I am positive that the intention of Benajah Doan was to deed to Sarah A. Doan the lands under consideration, and I think for life, but I am not cer-tain of this, or while she might live." "The certain set of children I am positive were S. A. Doan's by

John Doan.    But what were the other intentions of the disposition of said property I do not know."

"*Q.*   The fact that you got the impression that said lands were to be deeded to Sarah A. Doan for life, you get from what was said by Banajah Doan or those present at the time of making the deed?   *A.*   Well, sir, I do not recollect that; I may have gotten it from what was said, or from some other source; of course I can not recollect that.   It is too long ago.   To the best of my knowledge I think whether it came from some outside source or other, that Sarah A. Doan had a life estate in said lands, but I see that it is not in the deed.   As to what estate the children were to take I can not say anything plainer than what the deed says, and that says to her and her heirs."

In regard to the affidavit he testified:   "There was a man came here and seemed to be in a hurry to go back on the next train, and I just merely glanced at the affidavit, and my understanding of the affidavit was, that all they wanted was to prove that I wrote the deed and took the acknowledgment.   The man that came here told me so.   I signed the affidavit which is shown me."

There was some other evidence introduced upon collateral matters which however sheds no additional light upon the issue.   Upon the facts stated, and upon the evidence hereinbefore in substance set forth, the circuit court made and entered the following finding, decree and judgment:

"Now, on this 29th day of September, 1896, this cause coming on to be heard and determined, and both plaintiff and defendant answering ready for trial, the court, after hearing the evidence and argument of counsel, and being fully advised, doth find that the premises in question by deed of John Doan, deceased, and this defendant, made on the 4th day of October,

1876, and recorded in book number 7, at page 120, of the recorder's office of Grundy county, Missouri, together with certain other premises in said deed mentioned was conveyed to Benajah Doan, grantee in said deed in trust, for the purpose that said Benajah might, as he agreed, convey the said premises in said deed from the said John and this defendant to said Benajah mentioned, to this defendant for life, with the remainder to the children of this defendant by said John Doan that might survive her, and the court doth further find, adjudge and decree that by the deed of said Benajah, set out in plaintiff's petition and recorded in book Z, at page 640, he, the said Benajah, attempted to carry out and perform the conditions of said trust, and to convey said premises in said deed mentioned, being the premises in question herein, i. e., the north half of the southwest quarter of section twenty-six (26), and the north half of the southeast quarter, except six acres west of Muddy Creek, of section twenty-seven (27), township sixty-two (62), of range twenty-four (24), Grundy county, Missouri, to the said Sarah A. Doan, for and during her life, with remainder therein to her children by John Doan that might survive her, and the court doth find, adjudge and decree that said deed from the said Benajah, so recorded in book Z, at page 640, be so reformed, changed, and modified as to speak and carry out the intentions of the said parties, and to convey to this defendant, Sarah A. Doan, said premises for and during her natural life, with remainder therein to her children by John Doan, surviving her. And it is adjudged that plaintiff take nothing by this, his said action, but that defendant have judgment for her costs herein expended, and have execution therefor."

From which judgment the plaintiff appealed.

It being conceded that the deed of Benajah Doan

was executed in discharge of the trust reposed in him, when the title for that purpose was vested in him, by his brother John Doan, there is no ground for plaintiff's contention that a court of equity will not interfere to correct the deed for the reason that it was voluntary and without consideration; and both parties claiming under that deed as beneficiaries of the trust, and grantees of the trustee, there can be no ground for the contention that a court of equity will refuse to interfere for any want of mutuality in the mistake, if there was one. Nor do we see any basis for the contention that the defendant has been guilty of any laches that should prevent her from interposing her plea in this action. It seems to us that there are but two questions in the case: *First*, is the evidence sufficient to prove the mistake charged, so as to warrant a reformation of the deed; and, *second*, if sufficient, can it be used by the defendant to defeat plaintiff's action, in which the affirmative relief asked for can not be granted, for the reason that the other persons interested in the lands conveyed by the deed are not parties to the suit? Whether the second question need be answered at all or not, depends upon the answer returned to the first.

In an early case in this State it was said by Judge GAMBLE, speaking for the court, that: "The power of a court of equity to reform an instrument, which by reason of a mistake fails to execute the intention of the parties, is unquestionable. It is not material whether the instrument is an executory or executed agreement; nor is it material whether the proceeding is directly by bill to correct the mistake, or the mistake is set up in the answer by way of defense" (citing authorities); and, "Although it is said that the evidence required to prove a mistake must be as satisfactory as if the mistake were admitted, yet this and similar remarks of

judges, however distinguished, form no rule of law to direct courts in dispensing justice. When the mind of the judge is entirely convinced upon any disputed question, whether of fact or law, he is bound to act upon the conviction." *Leitendorfor v. Delphey*, 15 Mo. 161. In *Able v. Ins. Co.*, 26 Mo. 59, by SCOTT, J., it was said: "No written agreement will be reformed unless the evidence produced to show the mistake is clear and satisfactory." In *Modrell v. Riddle*, 82 Mo. 31, by SHERWOOD, J., it was said: "The same strength of evidence is necessary to establish a mistake in a written conveyance as to establish a trust;" and by the same judge in *Turner v. Shaw*, 96 Mo. 22: "In order to reach such a standard of probative efficacy the evidence must be clear, and positive, and convincing." In *State to use v. Frank's Adm'r*, 51 Mo. 98, by BLISS, J., it is said: "Every presumption is in favor of the instrument as it is, and the evidence must be unequivocal to show both that an error was committed and also its precise character. This implies the ability to show the language the parties intended to use."

In *Worley v. Dryden*, 57 Mo. 226, by WAGNER, J., it was said: "This court has gone as far as any in holding that before a deed can be contradicted and the title to land effected, there should not only be clear and unequivocal evidence, but there should be no room for reasonable doubt as to the facts relied on." In *Sweet v. Owens*, 109 Mo. 1, by GANTT, J., it is said: "The authorities all require that the parol evidence of the mistake must be 'most clear and convincing.' Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of evidence, but only a certainty of error." 1 Story's Equity Jurisprudence, secs. 157–161; Pomeroy's Equity Jurisprudence, sec. 859. *Tesson v. Ins. Co.*,

40 Mo. 33. And in *Bartlett v. Brown*, 121 Mo. 353, it was said by BURGESS, J.: "The mistake must be shown by testimony so clear and convincing as to leave no hesitancy in the mind of the chancellor of its existence." Mr. Beach in his work on Modern Equity Jurisprudence, volume 2, section 546, thus states the rule recognized here and elsewhere: "The party seeking to "have an instrument reformed for mistake must show the mistake by evidence that is clear, positive and convincing; for the written instrument, carefully and. deliberately prepared and executed, is evidence of the highest character and will be presumed to express the intention of the parties to it until the contrary appears in the most satisfactory manner."

The crucial question in the case is, does the evidence, in support of the plea, come up to the required standard?

As to the character of the evidence. It consists solely of the recollections of three witnesses, of declarations of John and Benajah Doan, both dead, said to have been made by them eighteen or nineteen years before being testified to. As was said by BLISS, J., in *Johnson et al. v. Quarles et al.*, 46 Mo. 427: "Evidence of such declarations, it is true, is admissible, but it never amounts to direct proof of the facts claimed to have been admitted by those declarations; and it is sometimes doubted whether it ought to be received at all when introduced for the purpose of divesting title created by deed." "This kind of evidence has always been received with great care, and when not supported by other evidence is generally entitled to but little weight." *Cornet v. Bertelsman*, 61 Mo. 127; in which case as in *Ringo v. Richardson*, 53 Mo. 385, the doctrine laid down in 1 Greenleaf, section 200, and note, in regard to this class of evidence, is approved. It is there said: "The evidence consisting as it does in the mere repe-

tition of oral statements is subject to much imperfection and mistake, the party himself either being misinformed, or not having clearly expressed his own meaning or the witness having misunderstood him. It frequently happens also, that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say. . . . . . When we reflect upon the inaccuracy of many witnesses, in their original comprehension of a conversation, their extreme liability to mingle subsequent facts and occurrences with the original transaction and the impossibility of recollecting the precise terms used by the party, or of translating them by exact equivalents, we must conclude there is no substantial reliance upon this class of testimony.'' The intrinsic weakness of this class of evidence is further enhanced in any given case by the length of time that has intervened since the declarations were made, and the ease with which it can be manufactured, and the temptation to do so, when all those by whom it could be contradicted are in their graves, and when as in this case, the defendant's plea is supported by this class of evidence only, it should be examined with great care.

When this suit was commenced the deed from Benajah Doan had been executed, delivered, and spread upon the records of Grundy county for more than fifteen years. All the grantees, so far as the evidence tends to show, had accepted it, claimed under it, used the land conveyed by it, divided and conveyed it upon the faith of the title as it was written in the deed. When the suit was instituted an issue was raised not as to whether the plaintiff as heir of his son had any title to the land, but as to his estate therein; the defendant maintaining that his estate was a fee in remainder, into the possession of which he could not

be let until the determination of her estate, which was an estate for life. This contention she maintained for more than two years and until the decision of this court in 128 Mo. 323, the opinion in which was handed down May 14, 1895, the effect of which was to dissipate this contention and make it necessary for the defendant to find some other defense to plaintiff's cause of action. The situation was urgent and demanded the prompt exercise of the fertile resources of ingenious counsel. The thing to be accomplished, however, was simple. All that was necessary, not only to defeat plaintiff's action, but to completely wipe out all title in him to any part of the land, was to add four little words to the deed, *"for life—surviving her,"* or their equivalents in the proper place in the deed, and to the accomplishment of this task her counsel immediately addressed themselves, in which they seem to have had the valuable assistance of Reeves S. Doan. On the fourteenth day of November, 1895, the answer of the defendant was filed, advising plaintiff *what was to be done*, and within twelve days thereafter, away off in the State of Ohio, the *ex parte* depositions of Benajah D. Doan and William P. Doan, advising him of *how it was to be done*, were secured after a four hours' consultation of defendant's counsel Knight and Reeves S. Doan with Benajah D.; and within a month thereafter, through the agency of this same Benajah D., at an expense of $23, copies of these depositions are placed before Williams, the notary and scrivener, and his *ex parte* affidavit secured. It does not appear from the record where or when the deposition of *Fairly* was taken, but Reeves S. Doan was there with his little memorandum and it was not taken until after a consultation between them. The memorandum Reeves S. was careful to take away with him, and although we can not tell what became of it, or whether the deposition of Fairly or those of

the two Doans were first taken, we do find Reeves in like consultation with Benajah D. in Ohio, when the latter depositions were taken. The studied terms in which the crucial words required for the purposes of the case are stated in the depositions of each of the witnesses, and the remarkable correspondence of their memory thereof, after such a lapse of time, suggest a recent and common source from which the exact words required are drawn, rather than the difficult recovery of them by memory from the long distant past, and leave upon the mind the indelible impression that in these depositions we have in fact only vague and indistinct recollections of the witnesses pointed for the purposes of the case, by the suggestions of defendant's counsel, her son, and perhaps by the little memorandum, and adopted consciously or unconsciously by the witnesses, to meet its exigencies. So that considering this evidence as a whole, the weakness that naturally belongs to such evidence is not at all relieved, but rather intensified in this case, by the circumstances attendant upon its procurement, the terms in which it is couched, and the manner of its delivery. Nor is its weakness relieved by a consideration of the evidence of each of the witnesses separately.

*Fairly*, John Doan's hired hand, undertakes to give the precise words required, from his recollection of loose conversations not addressed to, but overheard by him, nearly twenty years before, and *Benajah D. Doan* undertakes to give these words heard by him when a lad of sixteen, under like circumstances, nearly twenty years before. As was said in *Cornet v. Bertelsman*, 61 Mo. 127: "Courts of chancery have always been disposed to place little reliance upon testimony of loose conversations or confessions of a party when used to overturn a legal title. . . . . . . . This rule is not adopted because of want of credibility in the witness, but

in consequence of the extreme uncertainty of the human recollection, and the inability of the human mind to detail after years have elapsed, the exact language used by the parties to a loose conversation.. It would be too hazardous to divest titles upon such uncertainties.''

*William P. Doan* undertakes to give the contents of a letter which he had not seen for eighteen years, and which he makes the foundation of his evidence, and yet when he comes to give his reason for remembering its contents he puts words in the mouth of John Doan that would give an entirely different meaning to the deed. This but illustrates the inherent weakness of such evidence. The deed itself duly signed, acknowledged and delivered was infinitely better evidence of the intention and meaning of the parties than all this evidence. *King v. Isly*, 116 Mo. 155. And the deed as it is written is supported by the evidence of the scrivener who wrote it, notwithstanding the strenuous efforts made to array him against it, and to break the force of what he might say upon the subject. As all the evidence bearing materially upon the issue was either undisputed or contained in these depositions, the chancellor below had no better opportunity of weighing the evidence than we have. We have given every word of the evidence careful consideration, and answering the first question proposed on our own conscience, we must say that our minds are not convinced that the mistake charged was made in the deed. While there can be *no* doubt that in the execution of the deed, Benajah Doan endeavored faithfully to carry out the intentions of his uncle John; and there *is* room for doubt as to whether he intended that his lands should be conveyed to his wife for life, remainder in fee simple to his children by her; *or* in fee simple to his wife and his children by her; we are firmly persuaded that

it was *not* his intention to limit the fee to such of those children as might survive her, and that such an idea never would have been suggested to the mind of any-one, if Deborah's infant son had not died and the necessity of making such a plea had not arisen, in order to cut out the son-in-law from any estate in the lands.

This conclusion renders it unnecessary to return an answer to the second question. The judgment will therefore be reversed and the cause remanded to the circuit court with directions to enter up judgment in favor of the plaintiff for the one undivided fifth of the premises described in the petition. All concur. BAR-CLAY, J., in the conclusion reached on present appeal, not intending thereby to acquiesce in the decision on the former appeal.