## SUSAN A. McKEE v. HIGBEE et al.; SISSON, Appellant.

### Division Two, March 1, 1904.

1. **SPECIFIC PERFORMANCE: Lost Letter: Proof Necessary.** Where a contract which forms the basis for a prayer for a decree of specific performance was contained in a letter, and that letter has been lost, the terms of the contract must be established by the same clear, cogent and convincing proof that is necessary for the establishment of a parol contract. The rule, in such case, requires very strict proof.

2. ———: **Contract to Will Property.** In a suit for specific performance founded on an agreement by a decedent to will her property to a foster child, if she would make her home with her and be to her a daughter, the contract must be held to mean that decedent agreed to give the child all her property at the time of her death, for unless the contract included all her property, it did not specify what part of the property the child was to have, and hence the court could not determine what particular property to decree to her.

3. ———: ———: **Evidence.** The father of the girl, in response to a letter from decedent, said: "You say you will make Susie your heir and make a will immediately." The letter from the decedent to the father was lost, and the father's wife, thirty-two years after it was written, said that the decedent in that letter and in conversations with the child's father, had said that "she

would give all her property to Susie;" that "she would give her nephew, Tommy Higbee, some money;" that "she would will all her property and the property she inherited from her deceased son to Susie;" and that "she would make Susie her heir." *Held*, that this evidence does not establish with sufficient certainty the terms of the contract, and hence no decree for specific performance can be based thereon.

4. ————: Other Suit as Admission. Plaintiff sues to enforce a specific contract entered into between her aunt and her father in which she agreed to give all her property to plaintiff by will. Previously she had brought a suit to set aside deeds from the aunt to a nephew, in which she alleged that she, this nephew and another nephew, were the sole heirs of the aunt, and that the deeds had been obtained by the grantee by fraud and undue influence. *Held*, that while that allegation would not be sufficient to defeat this suit, if she in fact had such a contract, it was nevertheless a damaging admission, and adds to the uncertainty of the existence of the contract.

Appeal from Clark Circuit Court.—*Hon. E. R. McKee, Judge.*

REVERSED.

*T. L. & S. J. Montgomery* for appellant.

(1) The specific performance of a contract, in equity, is a matter not of absolute right to the party seeking it but of sound discretion in the court, which may withhold or grant relief according to the circumstances of each particular case. Hence, it requires much less strength of case on the part of the defendant to resist a bill to perform a contract, than it does on the part of plaintiff to maintain a bill to enforce specific performance. Veth v. Gierth, 92 Mo. 97; Paris v. Heiley, 61 Mo. 453; Young v. Daniels, 63 Am. Dec. 477; Johnson v. Hubbell, 2 Stock. Chan. N. J. 332; s. c., 66 Am. Dec. 773; 2 Story's Eq. Jurisprudence, secs. 769, 770. (2) In every contract four things must be clearly and definitely shown as essential prerequisites to its specific performance. They are, first, the names of the parties to the contract; second, the terms and condi-

tions; third, the interest or property; fourth, the consideration. Rose v. Purse (Colo.), 28 Pac. 473; Eppich v. Clifford, 6 Colo. 493. (3) It was never intended by deceased to do anything more than assist a relative, a mere voluntary act on the part of deceased as all the evidence shows, and is without consideration and mutuality and can not be enforced. Calton v. Graham, 84 Ky. 672; Glass v. Rowe, 103 Mo. 539; Waterman on Specific Performance (1 Ed.), sec. 196; Pomeroy's Equity Jur. (1 Ed.), secs. 1405-1409. (4) The terms and conditions of the alleged contract, before it can be specifically enforced, must be clearly and definitely proved. The proof must be clear and of such a forcible nature as to leave no room for reasonable doubt in the mind of the chancellor hearing the cause, as to its terms and character. If an inference is allowable at all, it must be a necessary and inevitable inference drawn from facts clearly and definitely proven. Railroad v. McCarty, 104 Mo. 9; Sutton v. Shipp, 65 Mo. 297; Hubbard v. Hubbard, 140 Mo. 30; Purcell v. Miner, 4 Wall. 517; Wallace v. Rappleye, 103 Ill. 249; Graham v. Graham, 34 Pa. St. 475; Wright v. Wright, 31 Mich. 380. (5) Before the contract can be enforced, in addition to the proof of the contract, there must be proof of so clear and forcible a nature as to leave no room for reasonable doubt, in the mind of the chancellor hearing the cause, that the acts performed refer to and result from that contract or agreement and are such as would not have been unless on account of that very agreement and with a distinct view to its performance. There must be no equivocation or uncertainty in the case. Story's Equity Jur., sec. 762; Phillips v. Thomson, 1 Johns. Ch. 31; Emmel v. Hayes, 102 Mo. 186; Semmes v. Worthington, 38 Md. 298; Ellis v. Railroad, 51 Mo. 200; Kinney v. Murray, 170 Mo. 701; McElvain v. McElvain, 171 Mo. 244; Steele v. Steele, 161 Mo. 566; Gibbs v. Whitwell, 164 Mo. 387; Ackerman v. Ackerman, 24 N. J. Eq.

587; Wallace v. Long, 105 Ind. 522; s. c., 55 Am. Rep. 222.

*Chas. Hiller, W. T. Rutherford* and *Smoot, Boyd & Smoot* for respondent.

(1)   Equity will decree the specific performance of a contract to make a will in consideration of personal services.   Sutton v. Hayden, 62 Mo. 101.   And this contract need not be in writing.   Gupton v. Gupton, 47 Mo. 37.   Although the statute requires wills to be made in writing, equity will specifically enforce a parol contract made upon sufficient consideration to dispose of property in a particular way by will.   Wright v. Tinsley, 30 Mo. 389.   And a verbal agreement of this sort in case of part performance will authorize a decree giving that agreement full force and effect.   Gupton v. Gupton, supra. And this decree will be rendered against the heirs and legal representatives of the decedent. Brinker v. Brinker, 7 Pa. St. 53; Goilmer v. Briston, 1 Vt. 48; Story, Equity Jurisprudence, sec. 785.   The contract entered into might have been discharged by deed or will.   Frye on Spec. Perf., 678.   (2)   Was the promise sufficiently definite?   The letter of the father makes the case plain:   "You will make her your child and heir and make a will in her favor immediately." The transcript shows, upon the testimony of all the witnesses, that she had agreed with the father to give Mrs. McKee her property and make a will in her favor.   Sutton v. Hayden, 62 Mo. 101.   Abundant proof was also made of repeated verbal promises to like effect by Mrs. Sisson, on the faith of which the plaintiff rendered the services in question.   Such declarations were competent evidence tending to confirm the proof of an agreement, and are admissible against appellants claiming as heirs and grantees.   Hambright v. Brockman, 59 Mo. 52; Stewart v. Glenn, 58 Mo. 481; Colt v. Landue, 54 Mo. 487; 1 Greenleaf on Evidence, sec. 171.   It was competent by such declarations in connection with the

conduct of the parties interested to prove an agreement enforcible in equity. Johnson v. Quarles, 46 Mo. 427; Underwood v. Underwood, 48 Mo. 531.

FOX, J.—This is an action for specific performance. The amended petition, upon which this cause was tried, and the answer, fully disclose the controverted questions involved. They are as follows:

"Plaintiff for amended petition states:

"That in the month of November, 1869, Emaline Sisson, who then resided in St. Francesville, Clark county, Missouri, was then a widow and childless, her only son having died in August preceding said date; that plaintiff was then a single woman, making her home with her father, T. W. Anderson, near Newark, Knox county, Missouri; that said plaintiff was the only daughter of Mrs. T. W. Anderson, who was the only sister of Emaline Sisson, and the said Emaline Sisson, being so childless as aforesaid, and desiring the association, company and companionship of this plaintiff, desired this plaintiff to come and live with her and become a daughter to her and take care of her and be her companion, and solicited her to so come and live with her, and if she would so come and live with her that she would give her her property at her death and make her her sole heir, and make her will immediately in her favor; that said plaintiff referred said Emaline Sisson to her father, T. W. Anderson, and agreed that if he would consent and make said contract that she would so come, reside with her, give her her filial affection and companionship and be a daughter unto her. Thereupon said Emaline Sisson, at the request of plaintiff, as aforesaid, arranged with the said T. W. Anderson, father of plaintiff, for the plaintiff to become her daughter, and gave her to the said Emaline Sisson. The said Emaline Sisson contracted and agreed with the said T. W. Anderson, father of the plaintiff, by and with the consent of plaintiff and in her behalf and with her knowl-

edge and consent, that if said plaintiff would become her daughter and care for her and render her the affection due from a daughter to her mother, she would give plaintiff all of her property at her death and make her her sole heir; that it was fully understood and intended by the said Emaline Sisson at the time of making said contract with the said T. W. Anderson, representing and consenting for said plaintiff, that plaintiff should at the death of the said Emaline Sisson be her sole heir and have all of her property, and that plaintiff and T. W. Anderson so understood said agreement and contract, and relying thereon plaintiff went to the home of the said Emaline Sisson, at St. Francesville, Clark county, Missouri, in the year 1869, and did care for her as a daughter and bestowed upon her the kindness and affection of a daughter, cared for her wishes and necessities until 1879, when plaintiff was married to John L. M. McKee; that before said marriage was consummated between plaintiff and John L. McKee, she procured the consent of Emaline Sisson to said marriage, and consulted her with reference to said marriage, and the said Emaline Sisson agreed and consented that plaintiff might marry John L. McKee, provided she would continue to live with her as she had done in the past, and stated and represented that the property was to be plaintiff's as she had contracted with plaintiff's father, and that plaintiff and her husband should stay there and take care of her and her property; that plaintiff and her husband did, in pursuance of said arrangement, stay at the home of Emaline Sisson during all the time the said Emaline Sisson remained in Missouri, and that they still so continue to there reside; that it was further agreed at the time when plaintiff went to live with Emaline Sisson in 1869 that if she would so come the said Emaline Sisson would immediately make her will in favor of plaintiff, giving her all of her property; that plantiff, confiding in said promise and relying thereon, faithfully cared for the said Emaline Sisson, gave her

the affection of a daughter, nursed her in sickness and attended to her wants and necessities continuously during the time of her residence in Missouri; that at the time of making said contract and by purchase since making said contract, the said Emaline Sisson was and became the owner of the following described real estate situate in Clark county, Missouri, viz.: fifty acres in the southwest part of the east half, northeast fourth; the northwest fourth, northeast quarter and southwest fourth, northeast quarter, and northwest fourth, southeast quarter, all in section 9, township 65, range 6, and also 40 acres in the northwest part, east half, southeast fourth, section 9, township 65, range 6 west; also 21.55 acres off east end, north half, southwest fourth, section 9, township 65, range 6; and also a piece of land and lots in St. Francesville, Clark county, Missouri, situated on Clark street, in Wayland's addition to the town of St. Francesville, being a tract 150x130 feet, upon which is situated the residence of said Emaline Sisson.    That about the year 1890 the said Emaline Sisson went to California to visit her brother; that during the time she was there plaintiff visited her on two different occasions, there in California, at the solicitation and request of the said Emaline Sisson, still stating to plaintiff that she would comply with said contract and make her the heir to all of her property; but while said aunt, Emaline Sisson, was in California, as aforesaid, and just before her death, which occurred in the early part of the year 1901, the defendant, Elmer Sisson, procured from the said Emaline Sisson a deed to the following described real estate situate in Clark county, Missouri, viz: fifty acres of land in the southwest part of the east half of the northeast quarter; northwest quarter of the northeast quarter, containing forty acres; the southwest fourth of the northeast quarter, containing forty acres; and the northwest fourth of the southeast quarter, containing 40 acres; all in section number 9, township 65, range 6 west, and containing in all 170 acres of land;

also all other land owned by me in Clark county, Missouri, except 61.55 acres deeded this day to Thomas Higbee, and a house and lot this day deeded to Susan A. McKee. That said deed was made without consideration by the said Emaline Sisson to said Elmer Sisson, and said deed was intended by said Emaline Sisson and accepted by said Elmer Sisson as a testamentary distribution of her property; that the said Emaline Sisson, without consideration, made a deed to defendant, Thomas E. Higbee, to the following described tract of land, situate in Clark county, Missouri, viz: (40 acres of land in the northwest part of the east half of the southeast quarter of section 9, township 65, range 6 west, and 21.55 acres in the east end of the north half of of the northwest quarter of section 9, township 65, range 6 west); that the said Emaline Sisson, without the knowledge or consent of plaintiff, made a deed to plaintiff conveying to her the following described property situate in St. Francesville, Clark county, Missouri, viz: on Clark street in Wayland's addition to said town of St. Francesville, it being a lot 150x130 feet in dimension and containing dwelling house in which the party of the second part now resides; that all of the deeds and conveyances so made as aforesaid to defendant were made without consideration, that on the — day of February, 1901, the said Emaline Sisson died, having wholly failed to perform her contract and agreement with plaintiff or without authorizing anyone else to fulfill her said contract and agreement with plaintiff; that she did not will to plaintiff her property as she agreed and contracted with plaintiff to do, but conveyed and assigned her property as hereinbefore stated, without consideration, and the estate of the said Emaline Sisson is wholly insolvent if the conveyances (and the defendant accepted the same with the knowledge of said contract with plaintiff) hereinbefore stated are permitted to stand; that plaintiff is wholly remediless by or through the ordinary processes and proceedings at law

and calls upon this court of equity for aid; that the said Emaline Sisson at the time of her death was also possessed of large sums of money amounting to many hundred dollars, the exact amount of which is unknown to this plaintiff, but of which amount the said Elmer Sisson is fully advised and that he has taken the same and appropriated the same to his own use. That by virtue of said contract and agreement and services rendered by plaintiff and affection given, plaintiff became and was in equity and good conscience entitled to all of the property described in this petition, and heretofore deeded to parties as hereinbefore set out, together with all personal property owned by the said Emaline Sisson at the time of her death. Wherefore plaintiff prays this court of equity to render a decree and order for the specific performance of the contract hereinbefore set out and decree the title to all of the lands hereinbefore mentioned and described in plaintiff, and divesting the title to the same out of these defendants, and that an account be taken of the moneys and personal property so taken by defendant, Elmer Sisson, and that the same be ordered paid into- this court for plaintiff as equity and good conscience both require, and for general relief.''

Thereafter on October 29, 1901, defendant, Elmer L. Sisson, filed his separate answer by leave of court to said amended petition (omitting formal parts) in words and figures following:

''Now comes Elmer E. Sisson, one of the above named defendants, and for separate answer to the amended petition of plaintiff, leave of court first had, denies each and every allegation in the petition contained or any knowledge or information thereof sufficient to form a belief.

''Defendant for further answer says, that Emaline Sisson, who was an aunt of plaintiff and this defendant, departed this life in the State of California on the 23rd day of February, 1901. That at the time of her death

and for many years prior thereto she resided with her brother, Henry C. Sisson, in the State of California, and at that date defendant also made his home with her said brother, his uncle, on their ranch about twelve miles from Red Bluff in said State; that Henry C. Sisson departed this life on the 17th day of April, 1901, in the State of California. Defendant says that Emaline Sisson in her lifetime, to-wit, on the 13th day of July, 1900, in order to dispose of her property situate in Clark county, Missouri, and divide it among those relatives she wished to be beneficiaries therein, made, executed and delivered thereto as mentioned and described in the petition, and to this defendant in addition to the land described in the petition, specifically, she added: 'Also all other lands owned by her in Clark county, Missouri, except 61.55 acres deeded this day to Thomas E. Higbee, and a house and lot this day deeded to Susan A. McKee. That on the 20th day of February, 1901, and before the death of the said Emaline Sisson, the deed conveying the land above described to this defendant, Elmer L. Sisson, was by H. P. Andrews delivered to him, and the said Andrews on the 20th day of February, 1901, mailed all of said deeds by registered letter to T. L. & S. J. Montgomery, with instructions to place the same on record, which was done on receipt thereof by them on the 1st day of March, 1901. That said deeds were made, executed and delivered in the State of California on the California forms, and lest the description of the lands should be imperfect or the titles to the lands described should not pass to the grantees or for any reason said deed should be defective, and in order to pass the title to any personal property she might own at the date of her death, should the deeds fail to correctly describe the land or pass the title thereto, made in due form of law signed and attested her last will and testament in words and figures as follows, to-wit:

" 'In the name of God Amen:  I, Emaline Sisson, a resident of Clark county, Missouri, but now stopping at Tehama county, California, and being of the age of 78 years, being of sound and disposing mind and memory, and not acting under duress, menace, fraud or undue influence of any character from any person or persons, do hereby declare this to be my last will and testament, and provide as follows:

" 'First.   I will and devise that my remains shall be decently but inexpensively buried in the cemetery at St. Francesville, Clark county, Missouri, and on the same lot with my deceased husband.

" 'Second.   I direct that my executor hereinafter named shall pay my funeral expenses and expenses of my last sickness as soon as sufficient money can be raised or acquired from my property.

" 'Third.   I direct that my nephews, Lewis B. Higbee and James Higbee, receive from my estate the sum of five dollars each and no more.

" 'Fourth.   I will and devise all of the remainder of my property of which I may die possessed of as follows, to-wit:   One-fourth to my nephew, Thomas E. Higbee, of Clark county, Missouri; three-fourths to my grand-nephew, Elmer L. Sisson, of Tehama county, California, upon the following conditions, that the income of one-third of the interest in said property received by the said Elmer L. Sisson shall be given by him to my brother, Henry C. Sisson, of Tehama county, California, during the life of the said Henry C. Sisson, and the income from one-third of the interest of my property received by said Elmer L. Sisson shall be paid by him to my niece, Susan A. McKee of Clark county, Missouri, during her life; I further direct that should my nephew Elmer L. Sisson die while unmarried and leave no children, that all of the share of my property willed to him shall go and become the property of my nephew, Thomas E. Higbee.

Vol 180 mo—18

" 'Fifthly and lastly. I hereby nominate and appoint T. L. Montgomery of Kahoka, Clark county, Missouri, the executor of this my last will and testament.

" 'In witness whereof, I have hereto set, attached my name and hereby declare this to be my last will and testament and hereby revoke all former wills made by me, this 13th day of July, 1900.

" 'EMALINE SISSON.

" 'On this 13th day of July, 1900, in the presence of us, the undersigned witnesses, Emaline Sisson signed this instrument consisting of one page besides this and declared it to be her last will and testament, and we, in her presence and in the presence of each other, and at her request, signed the same as witnesses thereto.

" 'H. P. ANDREWS,
" 'Red Bluff, California, Tehama county.
" 'R. O. SNELLING.
" 'Red Bluff, California, Tehama county.'

"Defendant denies that the deed made to him was without consideration or by fraud or undue influence of this defendant, had or exerted upon the said Emaline Sisson.

"Denies that this defendant at any time took or appropriated to his own use any money belonging to the said Emaline Sisson, but on the contrary the defendant says that at the date of the execution of the deed as aforesaid, and at the date of the death of the said Emaline Sisson she was indebted to this defendant for money loaned and advanced to her by this defendant.

"Denies each and every other allegation in the petition contained or any knowledge or information thereof sufficient to form a belief, and having fully answered prays to be discharged with his costs."

The testimony in this cause is voluminous, and the reasonable limits of this opinion prevent the insertion of it in detail. We have read, with a marked degree of

care, all of the testimony introduced in this cause, and shall be content with indicating the substance of it.

The plaintiff in this cause, Susan A. McKee, was the daughter of T. W. Anderson. ''The mother of plaintiff was a sister of Emaline Sisson and wife of T. W. Anderson. She died in 1857. And during that year the father married Susan A. Fuqua. There were three children by the first marriage, but in the year 1860 two died, leaving plaintiff as the only living child of the first marriage. At the date of the contract the father had other children by his second wife living with him.''

To sustain the issues as presented by the petition, plaintiff relies upon a contract, which it is contended was entered into by correspondence between Emaline Sisson and plaintiff's father, T. W. Anderson.

Emaline Sisson resided at the time it is said the contract was made, at St. Francesville, Clark county, Missouri. T. W. Anderson resided near Newark in Knox county, Missouri, a distance of thirty of forty miles from St. Francesville. It is claimed by plaintiff that Emaline Sisson, in the year 1869, wrote a letter to her father, T. W. Anderson, stating that since the death of her only child, a son, she was very lonely and asked him to give her his daughter (the plaintiff herein), and tells him if he will give her his daughter, she will immediately make a will in her favor, making the daughter her heir, and giving her all of her property. This letter is made the basis of the contract; in other words, it is claimed that this letter was written by Emaline Sisson, making the proposition, and that T. W. Anderson answered this letter on November 12, 1869, accepting the proposition. Plaintiff, the daughter of T. W. Anderson, whom Emaline Sisson wanted to live with her, was visiting Mrs. Emaline Sisson, and had been with her for some time, at the time it is claimed the correspondence took place. Plaintiff, at the time it is said this contract was made, was in her twenty-first year.

In the year 1885, T. W. Anderson and his second wife moved to Florida. T. W. Anderson is dead, and it is upon the testimony of his widow, Mrs. T. W. Anderson, plaintiff relies to establish the consummation of the alleged contract sought to be enforced by this proceeding. She gives her testimony by deposition, nearly thirty-two years after the correspondence takes place. We here quote from her testimony, which is specially applicable to the correspondence. She said:

"Q. During the time Emaline Sisson lived at St. Francesville, Missouri and you lived at Newark, Missouri, did she correspond with your husband's family? A. She did frequently.

"Q. State whether or not you were in the habit of reading the letters received by your husband's family from her? A. I was, I always read them.

"Q. State whether or not your husband during the latter part of the year 1869 had any correspondence with Emaline Sisson concerning his daughter Susan? A. He did.

"Q. Did you see and read any of this correspondence? A. I saw and read all, to the best of my knowledge.

"Q. During this time did you see and read any letters from Emaline Sisson to Mr. Anderson concerning his daughter Susan? A. I did.

"Q. To whom were Mrs. Sisson's letters concerning Susan directed, if you know? A. To Thomas Whiting Anderson.

"Q. Was he Susan's father? A. He was.

"Q. Who took care of Mr. Anderson's letters and papers and where were they kept? A. I took care of them, and they were kept in a large drawer of the bureau.

"Q. State whether or not about the last of the year 1869 any of your children were sick? A. Yes, one was quite low.

"Q. During the time this child was sick, did Mr. Anderson receive a letter from Emaline Sisson concerning his daughter Susan? A. He received two to my knowledge, perhaps four to the best of my knowledge; there were so many written I don't know how to answer it.

"Q. Did you read those letters? A. I read all of them.

"Q. In whose handwriting were they, if you know? A. Emaline Sisson's.

"Q. What was done with those letters after they were read by you and your husband? A. They were placed in the bureau drawer with his other letters and papers.

"Q. State what was done with the letters and papers placed in that bureau drawer if you know? A. In the fall of '84, I should have said winter of '84 and '85, the bureau was sold, and I requested Susan to take out the papers and letters and cull them or pick them out, the business papers from the social correspondence and burn them, forgetting that these letters of her aunt's and valuable notes were among them. She and Mrs. McKim burned them. I found out after I came to Florida my husband called for a valuable note and learned that it had been burned with those letters as he kept them together.

"Q. Were you present when they were burned? A. I was not present but left them there to be burned, which was done.

"Q. Whom did you instruct to burn them? A. Susan McKee.

"Q. Any one else? A. Mrs. McKee and I think some of the neighbors, but I don't know who they were.

"Q. Was there more than one Mrs. McKim there at that time? A. There was, but not there.

"Q. That was in Newark, Missouri? A. It was in Newark, Missouri, where we moved from.

"Q. Whom did you instruct to burn those papers

in that bureau drawer? A. Mrs. J. L. McKee, formerly Miss Susan A. Anderson, and Mrs. Natilia J. McKim, the wife of Dr. Joe M. McKim, who lived at that time at Newark, Missouri.

"Q. Have you ever made a search for the correspondence between Emaline Sisson and Mr. Anderson concerning the latter's daughter Susan? A. I have.

"Q. When and where did you make the search? A. First at Lake Butler in '86, when I was looking for a note; afterwards at White Springs in '91.

"Q. Have you made a search for that correspondence since 1891? A. I have.

"Q. When and where did you look? A. I think it was during the month of March, 1901.

"Q. Where did you look? A. In my trunk.

"Q. Is that where you usually keep such papers? A. Yes, that's where I keep all my papers.

"Q. Did you read the last letter received by your husband from Mrs. Sisson during the latter part of the year 1869 while your child was sick? A. I did.

"Q. Did that letter concern Mr. Anderson's daughter Susan? A. It did.

"Q. Have you that letter in your possession now? A. I have not.

"Q. Do you know where it is? A. I think Susie has it.

"Q. What was done with the letter after it was received by your husband? A. I put it among his papers.

"Q. Where were his papers and letters kept? A. In the bureau drawer.

"Q. What became of them if you know? A. They were among the other papers and letters that were destroyed in the bureau drawer; that's what I know.

"Q. Did you see them destroyed by fire? A. I did not see them.

"Q. State how you know they were burned then? A. I left them there for that purpose and would have

done it myself but the day being very unlikely and having to go through the country by private conveyance, I left it for my step-daughter, Mrs. J. L. McKee, to take out of the drawer of the bureau and destroy them by fire or burn them.

"Q.   State whether or not you instructed any one to destroy the papers in that bureau drawer, and if so whom? A.   Mrs. J. L. McKee and Mrs. Natilia J. McKim.

"Q.   Did you instruct them to destroy those papers? A.   I did.

"Q.   Where were you living at that time? A.   I was at Newark, Missouri, when I instructed them to burn the letters.

"Q.   Have you ever seen that letter since that time? A.   I have not.

"Q.   Since that time have you ever made a particular search for that particular letter? A.   I have.

"Q.   When and where did you look for it? A.   In '86 when looking for a note of value for my husband, while living in Lake Butler, Florida.

"Q.   Did you look about the home for it where you were living? A.   I don't know hardly how to answer it.   I looked for it in my trunk where I kept my papers, and that was in the home.

"Q.   Is that the only time you made a particular search for that particular letter? A.   It is not.   I made a search about March 20, 1901.

"Q.   Where did you search for it? A.   In the same trunk at White Springs, Florida, but I knew it to be a fruitless search when I looked, for the whole package of letters and papers had been destroyed; that those letters were with I should say Mrs. Sisson's letters I suppose.

"Q.   Please state the contents of that letter as near as you can remember it? A.   Well after passing the compliments of the day and so on I don't remember any of the news that she wrote except that her health

and Susan's, and importuning her father, Susan's father, to state postively if he would let her have Susan for her child and heir; that she would give her everything she owned if she would live with her.

"Q. Is that all she wrote in that letter about that matter? A. As well as I can remember she said she would give her nephew, Tommy Higbee, some money, as he was very fond of machinery; I can't remember all the letter, as it was quite a lengthy one.

"Q. State whether or not she said anything in that letter about making a will and if so what it was? A. She said she would make a will and will her what she had in property and what she had from her son."

The witness, Mrs. Anderson, identified the letter which she said was written by her husband, T. W. Anderson, to Mrs. Emaline Sisson, in answer to the letter which, it is said, was destroyed.

This letter was as follows:

"Newark, Nov. 12, 1869.

"Mrs. Emaline Sisson.

"Dear Friend: Your kind letter received sometime since, and the reason I did not answer sooner we have a very sick child, we have very little hope of it getting well. I am not feeling well. You say you are so lonely without my daughter, Susie, and you wish me to give her to you, and you will do a child's part by her and make her your heir, and you say you will make your *will* immediately in her favor. I will give my consent but feel very bad to part with my daughter. She being your sister's only child, and your son taken, and he being so anxious for her to take his place and wanting her to be your heir. Now I have one request, I want her to come home once a year and will be glad to have you come with her. I hope this will find you both well. My wife joins me in love to you both. I will be glad to hear from you both.

"Respectfully yours,

"T. W. ANDERSON."

Mrs. Anderson further testified in her deposition that in other letters written by Mrs. Emaline Sisson to T. W. Anderson, she stated that Susan, the plaintiff herein, was informed of the arrangement she was trying to make with Susan's father, for her to live with Mrs. Sisson. These letters, it is said, were also burned or destroyed.

Upon cross-examination, by defendant's counsel, in respect to the contents of the letter which was destroyed, Mrs. Anderson said:

"Q. It has been 32 years or thereabouts, has it not, since that letter was written? A. It has to the best of my knowledge.

"Q. That is a long time back to remember and give accurately what it contained, is it not? A. It is, only substance.

"Q. Then you are undertaking to give only your recollection of the substance of this letter? A. I am. I remember it more vividly on account of the trial it was to her father to decide to give her up.

"Q. That would not help your memory in giving the exact words used by Mrs. Sisson in that letter, would it? A. Of course I could not give the dictation of the letter. The sorrow would serve to impress it upon my memory.

"Q. Your recollection, was, as I understand it, that Mrs. Sisson requested the plaintiff's father in substance that Susan might live with her as her child, and that she would make her an heir to her property, is that correct? A. It would be correct if it was to make her heir according to my memory from the letter and conversation with her father and myself.

"Q. Then your recollection as to what the contract was is based upon the letter destroyed and conversation about the matter? Is that correct? A. It is, I think.

"Q. With whom did you have the conversations you say you based the recollection of the substance as

to what the contract was? A. My husband.

"Q. You never did have any conversation with Mrs. Emaline Sisson in her lifetime about the contract, did you? A. Not verbally, no."

The record further discloses that plaintiff lived with Mrs. Sisson for a number of years. In 1875, she married her present husband, Jno. L. McKee. After their marriage, they continued to live at the homestead of Mrs. Sisson, and were living there at the time of her death; Mrs. Sisson, after the marriage of plaintiff, went to California to visit a brother, Henry Sisson. She remained a year or so, returned to her home in Clark county, and then again went to California, where she resided with her brother for a number of years before her death. She died in California in February, 1901. The plaintiff, Mrs. McKee, visited her aunt, Mrs. Sisson, while in California. Prior to her death, and in July, 1900, Mrs. Sisson executed the deeds mentioned in the petition, to defendant, Elmer Sisson, Thomas Higbee and the plaintiff, and placed them in the hands of her attorney, Mr. Andrews, to be sent to Clark county for record. She also executed the will set forth in the answer of defendant Sisson. There was some correspondence between Mrs. Sisson and plaintiff during the time that Mrs. Sisson was in California. In one of the letters to Mrs. McKee she states that she had made her will, and that she had provided for the plaintiff, and told her she need not "worry," she would have enough to live on, if she lived a hundred and ten years.

Other testimony, consisting of conversations with Mrs. Sisson, was introduced by plaintiff.

Thomas S. Anderson, half-brother of the plaintiff, in his deposition, relates conversation about as follows:

"Q. Did you ever see your sister after she went to live with her aunt? A. I did.

"Q. State whether or not you ever visited her while she was living with her aunt and if so when and

how often? A. In the latter part of December, 1873. In the fall of 1875 and several times in the winter of 1878 and spring of 1879.

"Q. State whether or not at the time you made these visits you met your aunt, Mrs. Sisson, and had any conversation with her concerning the deposition of her property at her death? A. I did.

"Q. Where was Mrs. Sisson living at that time? A. At St. Francesville, Missouri.

"Q. Please give those conversations as near as you can remember them, beginning with the first. A. Well, the first conversation that I had was on my first visit. I asked my sister why she did not go home and stay. Her aunt told me that she was her child, my father had given her to her, and that was her home.

"Q. When you asked your sister why she did not go home was her aunt present? A. She was.

"Q. Now, you may proceed with those conversations, Doctor? A. She told me when Jimmy died that my father gave her to her, and that everything she had was hers. I had two or three conversations with her in regard to my sister, in the winter of '78 and spring of '79.

"Q. State what they were? A. She told me on two or three, two at least, different times, that she would give Sue everything she had; that she was the only child that she had living.

"Q. Where did these conversations take place? A. In Mrs. Sisson's home, in St. Francesville, Missouri."

This witness was between 14 and 16 years of age at the time of the conversations. These talks with his sister and Mrs. Sisson were about twenty or twenty-five years before this cause was tried.

Mrs. Grate, who says she is related to the plaintiff and Thomas Higbee, testified as to the conversations, partly as follows:

"Q. Did you have any conversation with her? A. Yes, sir; many a one.

"Q. Many times? A. Yes, sir.

"Q. Did she state how Sue happened to be there? If she stated how she happened to be there, state. A. Why, she come there to live with her as her child and to have her property, is what she told me.

"Q. Stated to you more than once? A. Yes, sir; I couldn't tell you the times but a good many times.

"Q. Did she ever state—I am calling your attention to it—did she ever state anything about the father of Mrs. McKee, anything taking place between them? A. Yes, sir; she has told me after Sue come and lived with her, she said she had written to Sue's father and asked him to let her come and live with her as her child and have her property and she was always going to remember Tommy.

"Q. Did she state whether or not she received any answer? A. Yes, sir; she wrote Sue's father. He answered the letter, gave his consent, but hesitated, not wanting Sue to leave home, particularly.

"Q. Have you heard that in many of her conversations? You talked to her more than once? A. Why, yes, sir.

"Q. How was she to pay Mrs. Sisson, by being a daughter to her? A. As a daughter would to her mother, so far as I knew.

"Q. Did she say anything that she had written to her father to see if he would let her come and would make her her child? A. Yes, sir; she did.

"Q. Will her property to her? A. Yes, sir; she says, 'I am going to give her my property. I wrote to her father and asked him if he would let her come and live with me, and he wrote and said he would but hesitated, didn't care for Sue to leave home, but as she was so lonely and had no one to live with her, and wanted Sue, he would consent to let her come—leave it

with her,' and she was to make her her heir and give her her property.

"Q. She told you this? A. Why, yes, sir; she told me that lots of times, she did."

Upon cross-examination, this witness said:

"Q. Now, then, she, in all of those conversations, said she was going to give Tommy something? A. Yes, sir.

"Q. With reference to Thomas E. Higbee? A. Yes, sir.

"Q. A defendant in this cause? A. Yes, sir.

"Q. And is related to you? A. He is my cousin.

"Q. Now, then, do you pretend to remember her exact words in these conversations with you? A. Oh, no, sir; I couldn't tell the exact words of all them that I remember.

"Q. You are simply giving the substance? A. The substance of the conversations.

"Q. The substance of the different conversations? A. Yes, sir.

"Q. You couldn't give any particular time when you had these conversations? A. I don't remember the dates at all."

There were a number of other conversations detailed by witnesses, of a similar character to those quoted.

On the part of the defendant, four or five witnesses, Dr. McKim, Dr. W. A. McKim, F. B. Poor, Mr. Towson, testified that they were familiar with the handwriting of T. W. Anderson; some of them had seen him write — had transacted business with him, and had known him intimately for a number of years; all of them stated that the signature to the letter purporting to be a letter from T. W. Anderson, in response to a letter from Mrs. Emaline Sisson, was not, in fact, his signature.

Robert Hume, who had experience, as recorder of deeds, and was in the banking business, expressed the opinion, as a witness, upon comparison with the admitted genuine signature of T. W. Anderson, that the signature to the letter to Mrs. Sisson was not that of T. W. Anderson.

Mrs. J. M. McKim testified that plaintiff, in 1866, did not live with her father, T. W. Anderson; but lived with her uncles Henry and Major Sisson. After she left them, she stayed two or three months with her parents; then she went to her uncle Adolphus Anderson; from there, she went to Mrs. Emaline Sisson's. This witness further stated that plaintiff had fallen out with one of the uncles she had been with, on account of some young man, and that was the cause of her going to Adolphus Anderson's. This witness further states that she was not instructed, as testified by Mrs. T. W. Anderson, to burn any letters in the bureau drawer, and that she did not burn any letters or assist the plaintiff in burning any. Numerous witnesses from California testified as to the fact that Mrs. Sisson lived in California a number of years just prior to her death, related conversations with her, in which she expressed the intention of at least giving some of her property to Elmer Sisson, relating the kindness shown her by young Sisson, and that she intended the bulk of her property to go to him. A number of the witnesses tell of her saying to them that plaintiff wanted all of her property, and that she was going to do as she pleased with it. Mrs. Sisson stated in some of these conversations that she did not get along agreeably with the plaintiff, and that the plaintiff always wanted her property. A number of these conversations were clearly inadmissible, and upon timely objections should have been excluded. The only conversation between Mrs. Sisson and the plaintiff, Mrs. McKee, that is testified to in this cause, was by the witness Mrs. Mary Leverony, of California. She relates this conversation thus:

"Q.  Did you at any time meet this niece from Missouri, Mrs. McKee, out here. in California?  A. Yes, sir.

"Q.  State when and where you saw her?  A.  At her aunt's.  I met her twice; I met her both times at her aunt's.

"Q.  You mean at Mrs. Sisson's?  A.  Mrs. Sisson's.

"Q.  Do you remember particularly of meeting her on her visit here in the winter or early spring of 1900?  A.  Yes, sir; I was there at the house several times.  I worked there; washed there one day, and then I went and helped Elmer one day with some turkeys.

"Q.  Did you at this time hear any conversation between Mrs. Sisson and Mrs. McKee as to Mrs. Sisson's property?  A.  I heard Mrs. McKee say to Mrs. Sisson as I went into the adjoining bed room, 'Aunt, make me your heir;' 'won't you make me your heir?' 'I will do as I please,' says the aunt."

Mr. Andrews, an attorney at law in California, testified that Mrs. Sisson had him, in 1899, prepare a will, which she executed, disposing of her property.  In respect to this will, Mr. Andrews testified as follows:

"Q.  Now, Mr. Andrews, state whether or not at the time referred to in 1899 you drew a will for Mrs. Sisson, and if so, what were the provisions thereof? A.  I did.  It provided generally that one-fourth of her property should go to Susan A. McKee, one-fourth to Thomas E. Higbee, one-fourth to Henry C. Sisson, and one-fourth to Elmer L. Sisson, with the further provision that should Henry C. Sisson die before Mrs. Sisson, that the share left him should go to Elmer; that Elmer L. Sisson should in that event receive one-half of all her property, Susan A. McKee one-fourth, and Thomas E. Higbee one-fourth.  I think that it had a further provision that the portion willed to Henry C. Sisson was

for his lifetime only, and should go to Elmer L. Sisson after his death.

"Q. State whether Mrs. Sisson duly executed and published the said will as her last will and testament? A. She did; and it was witnessed by Dr. J. M. West and myself.

"Q. Now state whether subsequently Mrs. Sisson indicated to you that she desired to make any changes in this will, and whether she did in fact make any changes therein. A. She did. She first left the will in my possession for a short time, and then wrote me a note to send the will to her, as she wished to look it over and make some changes. Later on she came to Red Bluff and told me that she wanted to either change that will or make a new one, as it didn't exactly suit her; that she wanted the portion of the property which she had willed to Sue only to remain Sue's property during the latter's lifetime. As she didn't want it to leave the Sisson family at any time: I saw her in Red Bluff again about November or December, 1899, and she stated to me on that occasion that she had intended bringing the will up with her so that she could indicate the changes she wanted to make, but that she had forgotten it, and would have to postpone making the corrections until she came to Red Bluff again. I didn't see her again until the occasion of my visit to her at the Sisson home.

"Q. State the time of that? A. January or February, 1900.

"Q. Now state what was said upon the occasion of this visit, if anything, as to the changes in the will and the disposition of her property, and as to Mrs. Susan A. McKee? A. Mrs. Sisson handed me the will and told me to take it and keep it until she came to Red Bluff, which she expected to do in a short time giving as her reason for returning it to me that Susan A. Mc-Kee was coming to make her a visit and that she knew Sue would look among her things and find the will, and

raise a row about it, as Sue was very greedy and wanted everything, and that she didn't want her to see the will. She stated further that when she came in she wanted to either change the will so as to make Sue's portion only for life, or else to straighten out the business by deeds, and asked me if she couldn't deed the ranch to Elmer. I told her she could. She requested me to write to Missouri and get the numbers of her land, stating that she wanted the portion of the property which she left to Elmer to be in such shape that there would be no chance of his losing it; that she owed it to Elmer and wanted him to have it.

"Q. Now, state, Mr. Andrews, whether after this time and in the month of July Mrs. Sisson called on you in Red Bluff and at your office and arranged some business matters. A. She called on me at my office July 13, 1900, and told me that she wanted to straighten out everything. I took the old will and she indicated the changes she wished made in it, but at the same time stated that she wanted me to make three deeds for her —one for Elmer L. Sisson, giving me specific directions as to the particular lands she wished described in his deed, one to Thomas E. Higbee, giving description of the lands she wished to give him, and one to Susan A. McKee, stating that she wished that deed to contain her house and lot in St. Francesville. She then asked me if there could be any possibility of all the land not being described in those deeds. I told her that it was not probable. She then said that in order to make the matter secure she wanted me to include in the deed to Elmer L. Sisson a general clause covering all the property she had in Clark county, except the property deeded to Mrs. McKee and Higbee. She went on then to discuss the matter of not having any property to go to Sue except for her lifetime, but stated that she was willing to deed the house and lot to Sue and that if Sue was contented with that she might have it outright.

She then asked me in reference to the deeds, if there was any possibility of their having them set aside. I told her I thought not, but that as I was not very familiar with Missouri law, I would not like to tell her positively that there was no possibility of the deed being set aside, as everything was possible. She said that she didn't want me to leave anything down and wanted me to also draw another will to be used in case there was any trouble about the deeds. She stated further that a will might be necessary anyway, as Mr. McKee had not made complete settlement with her in reference to the rent, and that she wanted all that settled. But that if everything was fixed up without it, I needn't present the will. I then, with the assistance of my clerk, Mr. R. O. Snelling, began to carry out her instructions.

"Q. Now state then Mr. Andrews, whether you prepared the deeds and the will, and whether or not they were duly executed by Mrs. Sisson and the deeds acknowledged and all witnessed. A. I did; I think that Mr. Snelling did the clerical work under my direction. Mrs. Sisson went away from the office and came back later during the day and waited until we had completed the work, and then executed the instruments. She signed the three deeds that had been made out according to her directions after having carefully examined them, and then she signed them. Mr. Snelling witnessed them and I acknowledged them as notary public. She read over the will carefully, then requested Mr. Snelling and myself to witness it, and she signed it in our presence, and we signed it as witnesses in her presence, and in the presence of each other, and she published and declared it to be her last will and testament.

"Q. Now state, Mr. Andrews, what was done with these deeds after they were thus executed. A. Mrs. Sisson directed me to keep them in my safe until such time as she should become seriously ill or should die, and then for me to send them to Clark county, Missouri, for

record.   She told me specifically never to let them leave my hands or possession unless it was to have them recorded or to turn over the deed to Elmer L. Sisson to him.   She stated further that she supposed I had the best place for keeping it, but that if I wished I might deliver Elmer's deed to him at any time, as she had fully made up her mind that that property belonged to him, and that she wanted him to have his deed.   I took the instruments, put them in my safe, and kept them until February, 1901, when I· was informed by Dr. J. M. West, Mrs. Sisson's attending physician, that she was very ill and that there was no chance of her recovery.   I then sent the deeds by registered letter to Messrs. T. L. & S. J. Montgomery, of Kahoka, Missouri, with directions that they have them recorded.''

It was further shown by the testimony of Mr. Andrews that at the time the deeds were executed by Mrs. Sisson, and left with him, she did not reserve any control whatever or any authority over them.

R. O. Snelling testified; his testimony corroborated that of Mr. Andrews.   Mrs. Amanda Anderson testified; her testimony partially corroborated the testimony of Mrs. McKim.   She testified partly upon her examination as follows:

''Q.   State your name, residence and age?   A. Amanda Anderson, Oakland, California, age 75 years.

''Q.   You are the widow are you of Adolphus Anderson?   A.   I am.

''Q.   About how many years have you lived in California?   A.   About 26 years.

''Q.   From what place did you come to California? A.   Monticello, Lewis county, Missouri.

''Q.   About how many years did you live at and near said place, Monticello?   A.   About 18 years.

''Q.   Are you acquainted with Susan A. McKee, the plaintiff in this action?   A.   Yes.

"Q. How long have you known her? A. Ever since she was about four years old.

"Q. She was the daughter, was she, of T. W. Anderson, of Newark, Missouri? A. She was.

"Q. What was the relationship, if any, between said T. W. Anderson, and your husband, Adolphus Anderson? A. They were brothers.

"Q. Where was said plaintiff, Susan A. Anderson, living when you first knew her? A. With her parents.

"Q. State where she next lived? A. She lived with her Uncle Henry and Uncle Major Sisson in Lewis county, Missouri.

"Q. About what was her age when she left home and came to live with Henry C. Sisson and Major Sisson? A. Between 18 and 21 years.

"Q. State why, if you know, she left her father's home, and went to the home of Henry C. Sisson and Major Sisson. A. She could not get along with her stepmother.

"Q. And was there any other reason than this? A. Her father was not able to do by her as they would like. Her father was not able to dress her as they would like and her uncles were.

"Q. Then Henry Sisson and Major Sisson were uncles of Susan A. Anderson? A. Yes.

"Q. Was there not still another reason for her leaving home at this time? A. Yes; she wanted to marry a man, and her father was not willing, and they (her uncles) took her home with them.

"Q. About how many years did she live with her uncles, Henry C. Sisson and Major Sisson? A. About three years.

"Q. Where did she then go from Henry Sisson's? A. She came to my house.

"Q. Where were you living at that time? A. Within a mile of Monticello, Lewis county, Missouri.

"Q. Why did she leave her uncle's place, and go to your place? A. She got mad at her aunts. She

wanted to marry a man by the name of Lane and they opposed it.

"Q. How long did she remain at your place? A. A few days, I do not remember how many.

"Q. Where did she then go? A. To Mrs. Emaline Sisson's, St. Francesville, Clark county, Missouri.

"Q. State, if you can, what this plaintiff said to you as to her going to Mrs. Sisson's? A. Well, she came out there and said she wanted to go to her Aunt Emaline's. She asked me if my oldest son, Canterbury, couldn't take her up there to Mrs. Sisson's.

"Q. Now state whether or not your son Canterbury, did take her to Mrs. Sisson's? A. Yes, he took his buggy and took her up to her aunt's.

"Q. Why and for what purpose did she go to Mrs. Emaline Sisson's? A. She had got mad at her aunts, because she wanted to marry this man and they objected.

"Q. Now state a little further, if you can, for what purpose she went to Mrs. Sisson's? A. To have a home; she had no home then when she got mad at her aunts.

"Q. What kind of home did she, in fact, have with her uncles? A. She could not have had a better home; she had a fine home; she had plenty of everything.

"Q. Was there any agreement, or contract, between Mrs. Emaline Sisson, and the father of this plaintiff as to her going to live with Mrs. Emaline Sisson? A. There was not.

"Q. Did the father have any knowledge at all of her going to live with Mrs. Sisson? A. None at all.

"Q. Did Mrs. Sisson even know that she was coming to her place before she went there? A. She did not.

"Q. Was there any sort of previous arrangement or agreement between Mrs. Sisson and the father of this plaintiff as to her going to live with Mrs. Sisson? A. No."

There was other testimony by J. T. and Canterbury Anderson, corroborating their mother, Mrs. Amanda Anderson, as to the residence of plaintiff with her uncles for a long time before she went to Mrs. Sisson's.

Testimony was introduced, tending to show the residence of Mrs. Sisson in California for a number of years before she died. Numerous statements by Mrs. Sisson to witnesses were introduced, in which it was claimed that she stated that plaintiff wanted to get all of her property; that she had done a good part by plaintiff, and that she intended to remember the defendant, Elmer Sisson.

The testimony of Dr. West and others clearly shows that at the time she executed the deeds and the will in dispute, she was in fair physical and mental condition; that her mind was clear and that she was a reasonably active, strong woman for her age.

It was shown in the trial of this cause (that is, April, 1901), that plaintiff Susan A. McKee, T. S. and Lewis Higbee instituted a suit against defendants Elmer Sisson and Henry C. Sisson, to set aside the deeds mentioned in the petition in this cause, on the ground that they were procured by fraud and undue influence. The allegations in the petition in that case fully recognize all of the parties mentioned as heirs of Emaline Sisson. That suit was at the September term, 1901, dismissed.

Plaintiff, in rebuttal, recalled Mr. S. Sisson, whose testimony tended to show that the signature to the letter in controversy was that of T. W. Anderson.

There was other testimony as to the general reputation of John L. McKee and his wife being good. Neither of these parties testified in the cause; we think clearly this testimony was inadmissible.

This is a sufficient recitation of the important parts of the testimony in this cause, to indicate the basis of the conclusion reached by the trial court. Upon the submission of the testimony, the court found the issues for the plaintiff, and accordingly entered a decree,

specifically enforcing the contract alleged in the petition.    From this judgment, defendant, Elmer Sisson, prosecuted his appeal and the record is now before us for review.

### OPINION.

Upon the record before us, it is apparent that there is but one proposition involved in this cause.    That is, are the facts, as disclosed by the record, sufficient to support the decree of the court, specifically enforcing the contract alleged in the petition?

The plaintiff in this cause, if the contract alleged in the petition was in fact made, could elect to resort to her action at law for damages for a breach of the contract, or a suit in equity for the specific performance of the terms of it.    By this suit, she chose the latter remedy, and having made the election, her right to the relief sought must find support in the application of the well-settled rules of equitable jurisprudence to actions of this character.

Specific performance of contracts is not a new question in this jurisdiction.    It has many times had the attention of this court, and while each case may present its own peculiar facts upon which the action must rest, the principles underlying the right to the relief sought, the nature, amount and character of proof required to authorize a decree of specific performance, are well settled, and the application of these principles to the facts disclosed in this cause must be the solution of the only question before us.

At the very threshold of the consideration of this question, we are met with the distinction which is clearly drawn by this court, as applicable to a plaintiff seeking specific performance, and a defendant resisting such a performance of the contract.

In Veth v. Gierth, 92 Mo. l. c. 104, NORTON, J., speaking for the court, said:

"A court of equity will not decree specific performance of a contract if not clearly established. [Paris v. Haley, 61 Mo. 453; Taylor v. Williams, 45 Mo. 80.] The principles announced by sections 769 and 770, 2 Story's Equity, apply peculiarly to this case. It is there said: 'It is important to take notice of a distinction between the case of a plaintiff seeking a specific performance in equity, and the case of a defendant resisting such a performance. We have already seen that the specific execution of a contract in equity is a matter, not of absolute right in the party, but of sound discretion in the court. Hence, it requires a much less strength of case on the part of a defendant to resist a bill to perform a contract, than it does on the part of the plaintiff to maintain a bill to enforce a specific performance. When the court simply refuses to enforce specific performance it leaves the party to his remedy at law. An agreement to be entitled to be carried into specific performance ought to be certain, fair and just in all its parts.' "

The basis of the contract sought to be enforced in this cause rests upon correspondence between Mrs. Emaline Sisson and T. W. Anderson. The proposition, it is claimed, was made by letter from Mrs. Sisson to T. W. Anderson, and this proposition was accepted by T. W. Anderson in the letter introduced in evidence. The letter by Mrs. Sisson making the proposition, so it is contended, was destroyed; hence, so far as the proposition by Mrs. Sisson is concerned, which is a vital part of the contract, the proof of it must rest upon parol testimony. The proposition, as made by this letter, the letter not being in existence, stands upon the same basis as though the proposition had never been reduced to writing, and as to the terms of the proposition requires the same clear and convincing proof as is necessary to the establishment of a parol contract.

In VanHorn v. Munnell, 22 Atl. 985, the Supreme Court of Pennsylvania announced this rule: "This

action, being brought upon a lost writing, the terms of which are to be supplied by oral testimony, must, so far as concerns the requirements of proof, stand upon the same basis as an action upon a parol contract. For specific performance in such cases, it is indispensable to prove, by the most clear and indisputable evidence, the precise terms of the agreement.''

It must be conceded that if the contract was in fact made, as alleged in the petition, a court of equity will specifically enforce it, but in actions to enforce contracts of that character, there is but one uniform expression by this court—that the proof of the contract must be clear, cogent and convincing.

The rule, as to the nature and character of the proof, which will authorize the chancellor, in decreeing a specific performance of a contract, is a very strict one, and correctly so. The party who comes into a court of equity asking a contract specifically enforced, must come prepared to make it clear that such a contract not only exists, but, as well, the terms of it, that the court may intelligently, by its decree, enforce such contract strictly in accordance with its terms.

No case for specific performance can rest upon doubtful or uncertain testimony; if so, the security of land titles would stand upon an extremely weak and unstable foundation. The correctness of this proposition is so well recognized that it seems, in this advanced age of our equitable jurisprudence, that it is. hardly necessary to cite authorities in support of it.

BRACE, J., in Kinney v. Murray, 170 Mo. l. c. 700 and 701, so clearly and forcibly announces the rule as to the enforcement of contracts of the character of the one involved in this cause, that we here quote what is said on that subject:

''A court of equity in this State will specifically enforce an oral contract to make a will in a particular manner, where a valuable consideration has been received for the promise and a fraud would be perpe-

trated upon the promisee or beneficiary unless the contract be performed. But, the proof of such a contract must be so cogent, clear and forcible as to leave no reasonable doubt in the mind of the chancellor as to its terms and character; and where the consideration consists of acts to be performed, there must be like proof that the acts performed refer to and result from that contract, and are such as would not have been done unless on account of that very agreement and with a direct view to its performance. 'There must be no equivocation or uncertainty in the case.' This doctrine is established, and its application illustrated, in a long line of cases. . . . When, as in this case, and in consonance with this doctrine, a court of equity is called upon to establish and enforce a contract of this character, in the teeth of the statute of wills, and of the statute of frauds and perjuries, and to set aside the disposition of valuable property made in conformity with the requirements of those statutes, there is devolved upon the chancellor the gravest responsibility, perhaps, that ever attaches to his high office. And nothing short of the inherent justice of the claim, supported by evidence that can be relied upon with the utmost confidence, proving the existence of the contract, its terms and conditions and a substantial and meritorious compliance therewith, with such certainty and definiteness as to leave no room for reasonable doubt, can ever justify the exercise of such an extraordinary prerogative.''

To the same effect is Rogers v. Wolfe, 104 Mo. 1. While in that case, the court was discussing the statute of frauds, yet in such discussion, it announces the principles applicable to the requisite proof of the contract. It was said by the court:

''By well-established rules of equity laid down by Judge STORY, and which have frequently received the sanction and approval of this court, 'it is not only indispensable that the acts done should be clear and definite,

and referable exclusively to the contract, but that the contract should also be established by competent proofs to be clear, definite and unequivocal in all its terms.    If the terms are uncertain or ambiguous or not made out by satisfactory proofs, a specific performance will not (as indeed upon principle it should not) be decreed. The reason would seem obvious enough, for a court of equity ought not to act upon conjecture, and one of the most important objects of the statute was to prevent the introduction of loose and indeterminate proof of what ought to be established by solemn written contracts.'    [1 Story, Eq. Jur., sec. 764; Berry v. Hartzell, 91 Mo. 132; Sitton v. Shipp, 65 Mo. 297; Paris v. Haley, 61 Mo. 453; Underwood v. Underwood, 48 Mo. 527.] 'There must be satisfactory proof, not merely of some agreement, leading to acts of part performance, in pursuance of which they are done, but sufficient to establish *the particular agreement* alleged.    The proof of this point must be satisfactory.'    [Sitton v. Shipp, supra.]    And this proof of the agreement should be 'of so clear and forcible a nature as to leave no room for reasonable doubt in the mind of the chancellor hearing the cause.'    [Railroad v. McCarty, 97 Mo. 214.]    And there must be like proof that the acts performed refer to and result from that agreement, and are such as would not have been done, 'unless on account of that very agreement and with a direct view to its performance.'    'There must be no equivocation or uncertainty in the case.' "

In Berry v. Hartzell, 91 Mo. l. c. 136, SHERWOOD, J., speaking for the court, invokes the same strict rule, as to the character of evidence to support an action for specific performance, as is applicable in suits to establish a resulting trust.    He said in that case:

"The contract remained unproven, except the loose declarations and admissions of Baskin, said to have been made shortly prior to his death, which evidence was entirely insufficient, unless strongly corroborated by

evidence of so cogent a character as to leave no room for reasonable doubt in the mind of the chancellor, who heard the cause. There was no such corroboration. The rule, just announced, as to the cogency of testimony necessary in cases of this sort, in respect to resulting trusts, is firmly established in this State (Johnson v. Quarles, 46 Mo. 423; Ringo v. Richardson, 53 Mo. 385; Kennedy v. Kennedy, 57 Mo. 73; Forrester v. Scoville, 51 Mo. 268), and no good reason is perceived why the same cogency of testimony is not necessary to establish a similar implied trust, or trust by operation of law, which has its origin in a contract between a vendor and a vendee, such as is claimed to exist in the present instance (Adams, Eq., *128; 2 Story, Eq. Jur., secs. 789, 790, 1212, 1201), since, in either case, the effect of the claim, if successful, will be the divestiture of the legal title of the adverse party, and the accomplishment of the transfer of that title to the claimant.''

This leads to the application of the rule uniformly announced by this court in actions of this character. Did the facts, as disclosed by the record before us, authorize and support the conclusions reached and decree rendered by the trial court? We have reached the conclusion that they do not.

It will be noted that the contract sought to be specifically performed is one in which it is contended that Mrs. Sisson contracted to give or will all of her property at the date of her death to the plaintiff.

It is apparent that this is the only theory upon which plaintiff can hope to maintain this action. For, unless the contract included all of her property at the time of her death, we would be met with the proposition that the contract did not specify what part of the property plaintiff was to have. Hence, the court would be at a loss to determine what particular property plaintiff was entitled to have decreed her under the contract. We have read, with a marked degree of care, every sentence of the testimony in this cause, and with greatest

deference to the learned and esteemed trial judge, we are unable to give our sanction to the decree rendered in this cause. To do so, in our opinion, would establish a precedent that would not only threaten, but destroy all the recognized safeguards which the law, for so many years, has wisely thrown around the security of land titles.

The testimony in this cause fails to establish the contract alleged in the petition by that clear, cogent and convincing evidence that the law demands. NAPTON, J., in Sitton v. Shipp, 65 Mo. 303, approvingly quotes the expressions of Chancellor Kent, wherein he says: "The agreement to be enforced must be clearly proved as charged in the bill."

At the very outset, under the testimony, we are met with the doubtful authenticity of the letter purporting to have been written by T. W. Anderson, but without expressing an opinion upon that controverted question, conceding for the purposes of this case that the letter was in fact written by Anderson, it falls far short of establishing the contract sought to be enforced. The mere recitation in that letter as to what the proposition was by Mrs. Sisson, can not be taken as sufficient proof of the proposition itself. Moreover, the testimony of Mrs. T. W. Anderson indicates very clearly that the letter by T. W. Anderson did not correctly recite what was contained in the letter from Mrs. Sisson. In the letter introduced, written by T. W. Anderson, it is recited that "you say you are so lonely without my daughter, Susie; you want me to give her to you and you will do a child's part by her and make her your heir and you say you will make your will immediately in her favor." According to the testimony of Mrs. Anderson, as to the contents of the letter, making the proposition for the contract, she says that Mrs. Sisson stated she would give her (meaning Susie) everything she owned, if she would live with her. Mrs. Anderson, during the progress of her testimony, next states: "As

well as I can remember she said she would give her nephew Tommy Higbee some money, as he was very fond of machinery; I can't remember all the letter as it was quite a lengthy one." Mrs. Anderson, in another part of her deposition, says: "She said she would make a will and will her what she had in property and what she had from her son."

Upon further examination, Mrs. Anderson in answer to a question made this statement, as to the contents of the lost letter, in which it is claimed the proposition for the contract was made:

"Q.   Your recollection was, as I understand it, that Mrs. Sisson requested the plaintiff's father in substance that Susan might live with her as her child, and that she would make her an heir to her property, is that correct? A.   It would be correct if it was to make her heir according to my memory from the letter and conversation with her father and myself.

"Q..   Then your recollection as to what the contract was is based upon the letter destroyed and conversation about the matter? Is that correct? A.   It is, I think.

"Q.   With whom did you have the conversations you say you based the recollection of the husband as to what the contract was? A.   My husband."

These different statements of Mrs. Anderson as to the contents of the letter, which forms so essential and vital a part of the contract, indicate beyond question the uncertainty of what the proposition was, if one in fact was made.

In the first place, she was to give all of her property to the plaintiff.   Nothing said about making a will. Simply going to give it to her, if she would live with her.   Second, she says that she would give her nephew, Tommy Higbee, some money; third, that she would will all her property and that property she got from her son, to the plaintiff; fourth, that she would make Susie her heir.   It will be noted in the letter of T. W. Ander-

son, he simply states, "you say you will make Susie your heir and make a will immediately in her favor;" no statement, as made by Mrs. Anderson, that she would give Susie all her property; no statement as to giving Tommy part of her estate in money; no statement that she would will all her property and that obtained from her son, to Susie; this clearly indicates, if Mr. Anderson in fact wrote the letter introduced, that he was not undertaking in such letter to recite the words used by Mrs. Sisson in her letter making the proposition for the contract.

Other testimony was introduced by plaintiff in the nature of conversations with Mrs. Sisson, for the purpose of corroborating the testimony of Mrs. Anderson, as to the contract. This court has spoken, in no doubtful terms, upon the weight to be attached to conversations as proof of a contract. It will be noted that a number of these conversations occurred twenty or twenty-five years before they were related in court, in the trial of this cause. In treating of declarations of this character, this court said, in Kinney v. Murray, supra:

"So far as these statements are concerned, many of which were not even admissible as evidence, it is only necessary as to such as were admissible to repeat what has been so often said and approved by this court: 'Evidence of such declarations, it is true, is admissible, but it never amounts to direct proof of the facts claimed to have been admitted by those declarations; and it is sometimes doubted whether it ought to be received at all when introduced for the purpose of divesting a title created by deed.' [Johnson v. Quarles, 46 Mo. l. c. 427.] 'This kind of evidence has always been received with great care, and when not supported by other evidence is generally entitled to but little weight.' [Cornet v. Bertelsmann, 61 Mo. l. c. 127.] 'The evidence, consisting as it does, in the mere repetition of oral statements, is subject to much imperfection and mis-

takes, the party himself either being misinformed. or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens also that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say. . . . When we reflect upon the inaccuracy of many witnesses in their original comprehension of a conversation; their extreme liability to mingle subsequent facts and occurrences with the original transaction, and the impossibility of recollecting the precise terms used by the party, or of translating them by exact equivalents, we must conclude there is no substantial reliance upon this class of testimony.' [1 Greenleaf, sec. 200; Johnson v. Quarles, supra; Ringo v. Richardson, 53 Mo. 385; Cornet v. Bertelsmann, supra; Berry v. Hartzell, 91 Mo. l. c. 137; Fanning v. Doan, 139 Mo. 392.]''

GANTT, J., in Teats v. Flanders, 118 Mo. l. c. 669, very aptly stated and made application of the rule on this subject. He said:

''The burden was on plaintiffs to establish this agreement by evidence that was cogent, clear and convincing, and in this they have most signally failed. The evidence merely established that Mrs. Flanders made some casual remarks, from time to time, to some of her acquaintances as to her intentions in disposing of her property. They were not made to plaintiff, and were without consideration. The contract alleged can not be established in this unsatisfactory way.''

Aside from this, the conversations themselves do not support the contract sought to be enforced. Mrs. Grate, the most important witness for plaintiff, so far as declarations of Mrs. Sisson are concerned, testified that Mrs. Sisson frequently stated, in connection with conversations as to her intention of giving her property to the plaintiff, that she intended to remember ''Tommy,'' meaning Higbee. Other witnesses refer to

the same fact, in the conversations with Mrs. Sisson. If this is to be regarded as proof of what she intended to do with her property at the time of her death, it is apparent that Higbee was to be remembered in the disposition of the property. This being true, what part of it was he to get and what portion was to go to the plaintiff? In order to specifically enforce this contract, the terms must be made definite and certain. If part of the property was to go to Higbee, then under the law, this contract can not be enforced for the reason, by the terms of the contract, it is not shown what part of the property was to be given to the plaintiff.

It is apparent that the conversations or most of them introduced by plaintiff, only tend to emphasize the uncertainty of the agreement plaintiff is seeking to specifically enforce.

Resting upon the testimony introduced by plaintiff alone, it would not authorize the specific performance of the contract alleged in the bill; and when we take into consideration all the facts surrounding this case, it simply makes the conclusion irresistible that plaintiff is not entitled to the relief sought in this action. At the very outset, plaintiff is confronted with the serious difficulty of establishing a contract alleged to have been entered into thirty-two years ago, a part at least of the evidence of which has been destroyed, and is compelled to rely upon the testimony of a witness advanced in years, who had not read the letter containing the proposition leading to the consummation of the contract, which constituted a vital part of it, for thirty-two years, to testify as to the contents of this important document.

There was other testimony introduced by defendant, tending to show that plaintiff, on account of some disagreement with her stepmother, was not residing with her father at the time it is claimed this contract was made with him; and had not been for about two years; but was living with her uncles, Henry and Major

Sisson. That she went from the residence of her uncle Adolphus Anderson to Mrs. Emaline Sisson's, just before this contract is said to have been made; that she was of age, being in her twenty-first year. It is further disclosed by the record that Mrs. Emaline Sisson resided in California for a number of years prior to her death, and while there, Mrs. Leverony testified to a very significant conversation between her and the plaintiff, on an occasion when the plaintiff was visiting her aunt. The witness said she heard the plaintiff ask Mrs. Sisson to make her (this plaintiff) her heir. Mrs. Sisson replied she would do as she pleased. If she had a binding contract to make her heir, and was to have all her property, it is strikingly singular that she should make such a request.

It is further shown that plaintiff, prior to the institution of this suit, brought an action to set aside the deed made to Elmer Sisson. In this petition, she alleges that she, Elmer Sisson, Henry Sisson and Thomas Higbee were the sole heirs, and sought by that suit to set aside the deed to defendant Elmer Sisson, for the reason it was procured by fraud and undue influence. This suit was dismissed. If she had a contract, with Mrs. Sisson, that she was to be the sole heir and that all her property was to be given her by will, she knew it as well at the time of the institution of the suit as she did afterwards. While this alone would not be sufficient to defeat a recovery, if it was clearly shown that she had such contract, yet in view of the uncertainty of the testimony, it is certainly a very damaging admission, and adds much force to the contention of the appellant, that there was never any contract of the nature sought to be enforced by this proceeding. Added to all this, we have the inference to be drawn from the conduct of Mrs. Sisson, as to the relation existing between her and the plaintiff. It is true she was advanced in years; but the testimony clearly shows that she was mentally all right, and for a woman of her age

in a reasonably fair physical condition. She had her niece, the plaintiff, with her at the old homestead for a number of years; gave her a home; paid her doctor's bills; when she married, gave her a piano. Finally, she leaves the home place, leaving plaintiff and her husband living there, and goes to California. There is an entire absence of any evidence showing any improper influences, in respect to her going to California. She makes her home in California until she dies. Some time before her death, she makes a will, in which she wills part of her property to the plaintiff. Afterwards, she changes her will and executes the deeds mentioned in the petition, in which she conveys different parts of her property to the plaintiff, Elmer Sisson and Thomas Higbee. At the time of the execution of these instruments, according to the undisputed testimony, she was mentally sound and proceeded alone to the office of her attorney, to transact the business and, as Mr. Andrews testifies, transacted the same in an intelligent and business-like way. Leaving out of consideration the different conversations in California with Mrs. Sisson by witnesses introduced by appellant, to some of which objection is made for the first time in this court, there can be but one legitimate inference drawn from her conduct, and that is that Mrs. Sisson never recognized that there was any contractual relation existing between them. The evidence does not disclose that appellant took any part in the transaction of the business of executing the will and deed by Mrs. Sisson, and there is an entire absence in the record before us of any indications that he exercised, or attempted to exercise, any improper influence with Mrs. Sisson, in respect to the disposition of her property.

Our attention is earnestly directed, by counsel for respondent, to the case of Sutton v. Hayden, 62 Mo. 101, as supporting the decree rendered in this case. An examination of that case will demonstrate that the conclusions reached were based upon clear and satisfactory

testimony. The learned judge who decided it simply stated that there was some conflicting testimony; but that the conflict was satisfactorily accounted for, and the witnesses who produced it were contradicted and impeached. In that case, there was strict proof of the contract as alleged, and the plaintiff resided with and cared for Mrs. Green continuously during her life, performing the services agreed to be performed under the contract, and she was clearly entitled to recover. That is not this case. The testimony in the case at bar falls far short of complying with the rule that requires clear, cogent and convincing testimony of the agreement. The evidence is not only uncertain and doubtful, as to there being any contract between Mrs. Sisson and the plaintiff, but it is so clearly so as to the terms of it, there is no escaping the conclusion that no decree for specific performance can be based upon it. While it may be that the adherence to the strict and well-recognized rules, in respect to the clearness and cogency of testimony required in actions of this character, may result in some instances in the defeat of meritorious causes, yet, when we consider the safety and security of land titles and property rights, which the law should guarantee to every citizen and his children, it must be conceded that the rule is a just, equitable and wise one.

Applying it to the facts in this case results in the conclusion that the testimony is insufficient to support the decree and divest the legal title of appellant to the real estate involved.

The decree and judgment in this cause is reversed and bill dismissed, as to the appellant Elmer L. Sisson.

All concur.